**23-1119 (L), 23-1122, 23-1154**

IN THE

# United States Court of Appeals

### FOR THE FOURTH CIRCUIT

◆◆

ELIZABETH SINES; SETH WISPELWEY; MARISSA BLAIR;
APRIL MUÑIZ; MARCUS MARTIN; JOHN DOE; NATALIE ROMERO;
CHELSEA ALVARADO; THOMAS BAKER,

—and—

*Plaintiffs-Appellees,*

TYLER MAGILL; HANNAH PEARCE,

*Plaintiffs,*

(*Caption continued on inside cover*)

—————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

---

## OPENING/RESPONSE BRIEF OF
## PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

---

RAYMOND P. TOLENTINO
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

DAVID E. MILLS
JOSHUA M. SIEGEL
CAITLIN B. MUNLEY
ROBBY LEE RAY SALDAÑA
KHARY J. ANDERSON
COOLEY LLP
1299 Pennsylvania Avenue, NW,
   Suite 700
Washington, DC 20004
(202) 842-7800

ALAN D. LEVINE
COOLEY LLP
55 Hudson Yards
New York, New York 10001
(212) 479-6000

ROBERTA A. KAPLAN
GABRIELLE E. TENZER
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

KAREN L. DUNN
JESSICA E. PHILLIPS
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

YOTAM BARKAI
MELINA MARIA MENEGUIN LAYERENZA
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10118
(212) 373-3000

*Attorneys for Plaintiffs-Appellees/Cross-Appellants*

—v.—

MICHAEL HILL; MICHAEL TUBBS; LEAGUE OF THE SOUTH,

*Defendants-Appellants,*

—and—

JASON KESSLER; RICHARD SPENCER; CHRISTOPHER CANTWELL; JAMES ALEX FIELDS, JR.; VANGUARD AMERICA; ANDREW ANGLIN; MOONBASE HOLDINGS, LLC.; ROBERT AZZMADOR RAY; NATHAN DAMIGO; ELLIOTT KLINE, A/K/A Eli Mosely; IDENTITY EVROPA; MATTHEW HEIMBACH; DAVID MATTHEW PARROTT, A/K/A Matthew Parrott; TRADITIONALIST WORKER PARTY; JEFF SCHOEP; NATIONAL SOCIALIST MOVEMENT; NATIONALIST FRONT; AUGUSTUS SOL INVICTUS; FRATERNAL ORDER OF THE ALT-KNIGHTS; MICHAEL ENOCH PEINOVICH; LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN; EAST COAST KNIGHTS OF THE KU KLUX KLAN, A/K/A East Coast Knights of the True Invisible Empire,

*Defendants.*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1,

Plaintiffs-Appellees/Cross-Appellants Elizabeth Sines, Seth Wispelwey, Marissa

Blair, April Muñiz, Marcus Martin, John Doe, Natalie Romero, Chelsea Alvarado,

and Thomas Baker make the following disclosures:

- None is a publicly held corporation or other publicly held entity.

- None has any parent corporations.

- None has 10% or more of their stock owned by a publicly held corporation or other publicly held entity.

- None is a trade association.

- No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation.

- This case does not arise out of a bankruptcy proceeding.

- This is not a criminal case in which there was an organizational victim.


*/s/* Raymond P. Tolentino
Raymond P. Tolentino

*Attorney for Plaintiffs-Appellees/Cross-Appellants*

Dated: June 23, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... iii

PRELIMINARY STATEMENT ............................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 4

STATEMENT OF THE ISSUES ............................................................. 5

STATEMENT OF THE CASE ............................................................... 5

    A. Factual Background ................................................................. 5

    B. District Court Proceedings ..................................................... 12

SUMMARY OF THE ARGUMENT ....................................................... 18

ARGUMENT ........................................................................................ 20

    I. Standard of Review .............................................................. 20

    II. Virginia's Statutory Cap on Punitive Damages Does Not Support
    the District Court's Reduction of the Jury Award ..................... 21

        A. The Punitive Damages Cap Does Not Apply to Defendants'
        Egregious Conduct Involving Violations of Virginia's Hate-
        Crime Statute. ................................................................... 22

        B. Even if the Punitive Damages Cap Applied Here, the District
        Court's Refusal to Apply It on a Per-Plaintiff Basis Would
        Require Reversal ............................................................... 28

            1. Original meaning and general principles of joinder support a
            per-plaintiff interpretation. ............................................ 29

            2. Virginia canons of statutory interpretation support a per-
            plaintiff interpretation. .................................................. 35

3. Constitutional avoidance concerns support a per-plaintiff interpretation..................................................................40

4. Persuasive authority from other jurisdictions supports a per-plaintiff interpretation....................................................42

5. The district court erred in deeming irrelevant virtually all these authorities. ..............................................................44

III. Appellants Provide No Basis to Disturb the District Court's Finding of Joint and Several Liability..........................................47

A. Appellants Forfeited Their Challenge to Joint and Several Liability....................................................................47

B. In Any Event, Virginia Law Clearly Establishes That Appellants Are Jointly and Severally Liable.........................................49

1. Appellants are liable for all damages committed as part of their conspiracy. .............................................................50

2. Appellants' counterarguments, if not forfeited, are meritless.........53

CONCLUSION ....................................................................59

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Al-Abood ex rel. Al-Abood v. El-Shamari,*
   217 F.3d 225 (4th Cir. 2000) ............................................... 3, 16, 29, 45

*Aleman v. Chugach Support Servs., Inc.,*
   485 F.3d 206 (4th Cir. 2007) ............................................................38

*Almy v. Grisham,*
   639 S.E.2d 182 (Va. 2007) ................................................................51

*Anderson v. Anderson Tooling, Inc.,*
   928 N.W.2d 821 (Iowa 2019) ...................................................... 57, 58

*Andrews v. Ring,*
   585 S.E.2d 780 (Va. 2003) ................................................................22

*Atlas Food Sys. & Servs. Inc. v. Crane Nat'l Vendors, Inc.,*
   99 F.3d 587 (4th Cir. 1996) ..............................................................56

*Bagley v. Shortt,*
   410 S.E.2d 738 (Ga. 1991) ...................................................... 38, 42, 43

*Barbara v. Adams,*
   40 Va. Cir. 557 (1994) ......................................................................35

*Barber v. Whirlpool Corp.,*
   34 F.3d 1268 (4th Cir. 1994) ............................................................57

*Bd. of Supervisors of King & Queen Cnty. v. King Land Corp.,*
   380 S.E.2d 895 (Va. 1989) ........................................................ 23, 24

*Beason v. I. E. Miller Servs., Inc.,*
   441 P.3d 1107 (Okla. 2019) ..............................................................41

*Bostock v. Clayton Cnty., Georgia,*
   140 S. Ct. 1731 (2020) ......................................................................33

*Bresler v. Wilmington Trust Co.,*
   855 F.3d 178 (4th Cir. 2017) ............................................................20

iii

*Brin v. A Home Come True, Inc.*,
 79 Va. Cir. 33 (2009) ............................................................54

*Bulala v. Boyd*,
 389 S.E.2d 670 (Va. 1990)...................................... 23, 30, 37

*Burns v. Bd. of Supervisors of Stafford Cnty.*,
 315 S.E.2d 856 (Va. 1984)...................................................33

*Carson v. City of Prichard*,
 709 So. 2d 1199 (Ala. 1998) ...............................................44

*Cawlo v. Rose Hill Rsrv. Homeowners Ass'n, Inc.*,
 106 Va. Cir. 235 (2020) ................................................ 33, 38

*Clark v. Martinez*,
 543 U.S. 371 (2005)....................................................... 33, 42

*Commonwealth v. Doe*,
 682 S.E.2d 906 (Va. 2009)............................................ 40, 41

*Commonwealth v. Squire*,
 685 S.E.2d 631 (Va. 2009)...................................................35

*Davis v. White*,
 No. 7:17-cv-01533, 2022 WL 3083458 (N.D. Ala. Aug. 3, 2022) ....................44

*De Simone v. VSL Pharms., Inc.*,
 36 F.4th 518 (4th Cir. 2022) ...............................................49

*Dominion Res., Inc. v. Alstom Power, Inc.*,
 825 S.E.2d 752 (Va. 2019).............................................56, 57

*Dunlap v. Cottman Transmission Sys., LLC*,
 754 S.E.2d 313 (Va. 2014).....................................................51

*Estate of McCall v. United States*,
 134 So. 3d 894 (Fla. 2014)................................... 40, 41, 42

*Farm Labor Org. Comm. v. Stein*,
 56 F.4th 339 (4th Cir. 2022) ...............................................20

iv

*Feltner v. Columbia Pictures Television, Inc.*,
  523 U.S. 340 (1998) ...................................................................58

*Gelber v. Glock*,
  800 S.E.2d 800 (Va. 2017)................................................... 51, 54

*Gen. Inv. Co. of Conn. v. Ackerman*,
  37 F.R.D. 38 (S.D.N.Y. 1964) ...................................................34

*Hadeed v. Abraham*,
  103 F. App'x 706 (4th Cir. 2004) ..............................................49

*Hicks v. Ferreyra*,
  965 F.3d 302 (4th Cir. 2020).............................................. 48, 50

*Hohlbein v. Heritage Mut. Ins. Co.*,
  106 F.R.D. 73 (E.D. Wis. 1985) ................................................34

*In re Butcher*,
  125 F.3d 238 (4th Cir. 1997)......................................................40

*In re KBR, Inc. Burn Pit Litig.*,
  893 F.3d 241 (4th Cir. 2018)......................................................58

*In re Under Seal*,
  749 F.3d 276 (4th Cir. 2014)......................................................50

*In re Webb*,
  214 B.R. 553 (E.D. Va. 1997).....................................................23

*Irwin v. Town of Ware*,
  467 N.E.2d 1292 (Mass. 1984) ..................................................44

*Joseph v. Allen*,
  712 F.3d 1222 (8th Cir. 2013) ...................................................49

*Kontrick v. Ryan*,
  540 U.S. 443 (2004)....................................................................48

*La Bella Dona Skin Care, Inc. v. Belle Femme Enters., LLC*,
  805 S.E.2d 399 (Va. 2017).................................................. 51, 55

*Liberty Mut. Ins. Co. v. Triangle Indus.*,
   957 F.2d 1153 (4th Cir. 1992) ...............................................................58

*Livingston v. Cnty. of Fairfax*,
   No. 08-cv-8875, 2009 WL 7339863 (Va. Cir. Ct. Apr. 28, 2009) .....................34

*Manu v. GEICO Cas. Co.*,
   798 S.E.2d 598 (Va. 2017)....................................................................24

*Moore v. Rohm & Haas Co.*,
   497 F. Supp. 2d 855 (N.D. Ohio 2007)................................................34

*Nat'l Ass'n of Mfrs. v. Dep't of Defense*,
   138 S. Ct. 617 (2018) ..................................................................... 27, 28

*Norfolk Southern Ry. Co. v. Lassiter*,
   68 S.E.2d 641 (Va. 1952)......................................................................23

*Ortiz v. Barrett*,
   278 S.E.2d 833 (Va. 1981)....................................................................32

*Owens v. DRS Auto. Fantomworks, Inc.*,
   764 S.E.2d 256 (Va. 2014)....................................................................37

*Parrish v. Hicks*,
   28 Va. Cir. 475 (1992) ................................................................... 31, 32

*Rasnick v. Pittston Co.*,
   5 Va. Cir. 336 (1986) ..........................................................................32

*Rector & Visitors of Univ. of Virginia*,
   387 S.E.2d 772 (Va. 1990)....................................................................23

*Resnick v. Patton*,
   258 F. App'x 789 (6th Cir. 2007) .......................................................49

*Rhyne v. K-Mart Corp.*,
   562 S.E.2d 82 (N.C. Ct. App. 2002) ............................................. 38, 44

*Rhyne v. K-Mart Corp.*,
   594 S.E.2d 1 (N.C. 2004)....................................................................43

*Robinson v. Equifax Info. Servs., LLC,*
  560 F.3d 235 (4th Cir. 2009).....................................................48

*S.D. Warren Co. v. Me. Bd. of Env't Prot.,*
  547 U.S. 370 (2006)..................................................................22

*Salve Regina Coll. v. Russell,*
  499 U.S. 225 (1991)..................................................................20

*Saval v. BL Ltd.,*
  710 F.2d 1027 (4th Cir. 1983) ..................................................34

*Sellers v. Bles,*
  92 S.E.2d 486 (Va. 1956)..........................................................27

*Station #2, LLC v. Lynch,*
  695 S.E.2d 537 (Va. 2010)........................................................51

*Sykes v. Brady-Bushey Ford, Inc.,*
  69 Va. Cir. 219 (2005) ..............................................................38

*Tire Eng'g & Dist., LLC v. Shandong Linglong Rubber Co., Ltd.,*
  682 F.3d 292 (4th Cir. 2012)................................................ 51, 52, 57

*United Mine Workers of Am. v. Gibbs,*
  383 U.S. 715 (1966)..................................................................38

*United States v. Simms,*
  914 F.3d 229 (4th Cir. 2019) (en banc) ...................................33

*Virginia Soc. for Hum. Life v. Caldwell,*
  500 S.E.2d 814 (Va. 1998)................................................... 40, 41

*Wackenhut Applied Techs. Ctr., Inc. v. Sygnetron Prot. Sys., Inc.,*
  979 F.2d 980 (4th Cir. 1992)........................................ 24, 25, 27, 42

*White v. Celotex Corp.,*
  878 F.2d 144 (4th Cir. 1989).....................................................56

*Williams v. Pro. Transp. Inc.,*
  294 F.3d 607 (4th Cir. 2002).....................................................48

vii

*Worrie v. Boze*,
    95 S.E.2d 192 (Va. 1956) .............................................................. 51, 55

*Wright v. Eli Lilly & Co.*,
    66 Va. Cir. 195 (2004) ................................................................ 38, 53

*Yamaha Motor Corp., U.S.A. v. Quillian*,
    571 S.E.2d 122 (Va. 2002) ................................................................35

*Young v. Commonwealth*,
    643 S.E.2d 491 (Va. 2007) ................................................................36

**Statutes**

28 U.S.C. § 1291 ...............................................................................5

28 U.S.C. § 1331 ...............................................................................4

28 U.S.C. § 1367 ...............................................................................4

Ala. Code § 6-11-21(a) .....................................................................44

Ga. Code § 51-12-5.1 ........................................................................42

N.C. Gen. Stat. § 1D-25 ...................................................................43

Va. Code § 8.01-2(1) .........................................................................30

Va. Code § 8.01-38.1 .............................................................. passim

Va. Code § 8.01-42.1 .............................................................. passim

Va. Code § 8.01-267.1 .......................................................................38

Va. Code § 8.01-267.5 .................................................................. 31, 32

Va. Code § 8.01-272 ..................................................................... 31, 32

Va. Code § 8.01-281 ..........................................................................32

Va. Code § 8.01-581.15 ................................................................. 30, 37

**Rules**

Federal Rule of Civil Procedure 20 ........................................... 32, 33, 34

Federal Rule of Civil Procedure 41 ........................................................18

Federal Rule of Civil Procedure 54 ........................................................18

**Other Authorities**

1 Alfred W. Gans, Charles F. Krause & Stuart M. Speiser, *American Law of Torts* § 3:4 (2023)..........................................................................................54

2B Sutherland Statutory Construction § 54:4 (7th ed.) ...........................23

7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1652 (3d ed. 2023)..........................................34

15A C.J.S. Conspiracy § 21 (2023) ................................................. 54, 55

1987 Va. Acts 1767....................................................................................26

Betty Booker & Dale Eisman, *Focus on Limits in Injury Awards May Be Shifted*, Richmond Times-Dispatch, Feb. 20, 1987 ..........................24

Black's Law Dictionary (5th ed. 1979) ....................................................30

Jeanne Cummings, *Damage Cap Compromise Being Forged*, Richmond Times-Dispatch, Feb. 20, 1987 ..........................................................24

Michael Hardy, *Senate Gets Jitters Before Backing Tort Package*, Richmond Times-Dispatch, Feb. 10, 1987..........................................24

Moore's Federal Practice—Civil § 20.02 (2022) ....................................34

Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967 (2021)..............23

The Liability Insurance Crisis and the Need for Tort Reform, Report to the Governor and the General Assembly of Virginia, S. Doc. No. 11 (1987) ..........24

## PRELIMINARY STATEMENT

In 2017, the Defendants in this case—a group of white supremacists, white nationalists, and neo-Nazis fueled by racist and antisemitic hatred—conspired to plan, promote, and carry out the violent "Unite the Right" rally in Charlottesville, Virginia. They made good on those plans on a fateful weekend in August 2017, leaving death and devastation in their wake. The central issue in these consolidated appeals is whether Virginia law allows these individuals to evade a full reckoning for their egregiously wrongful conduct. It does not.

After a 22-day trial in which a jury considered over 900 exhibits and testimony from 35 witnesses, the jury determined that several Defendants had violated Virginia's civil hate-crime statute; that one had committed assault and battery and intentional infliction of emotional distress; and that all Defendants, including the four Appellants here, were liable for their role in the overarching state-law civil conspiracy. The jury awarded over $26 million in damages, including more than $2 million in compensatory damages and an additional $24 million in punitive damages. Several Defendants filed a slew of motions seeking to upend the verdict. The district court properly rejected nearly all their arguments—but it agreed with them on one highly consequential point of law and slashed the jury's damages award by over $23 million. Appellants now ask this Court to further reduce their liability on a novel basis they did not argue in the district court.

This Court should restore the jury's verdict, not stray further from it. The district court reduced the jury's punitive damages award to $350,000, across all eight Plaintiffs seeking punitive damages, based on a sweeping interpretation of Va. Code § 8.01-38.1, an insurer-focused statute that limits certain recoveries of punitive damages. In the district court's view, this cap applied even to claims involving hate crimes. That was error. No other court has ever held that the punitive damages cap applies to a hate-crime case, and for good reason. The statute's text and purpose make clear that the General Assembly enacted the punitive damages cap to limit recovery for plaintiffs in run-of-the-mill tort actions, not to shield the perpetrators of racist and antisemitic hate crimes from full accountability.

More significantly, the district court seriously misapplied Virginia law when it applied Va. Code § 8.01-38.1 across all eight Plaintiffs seeking punitive damages. No court (save for the district court) has ever held that this cap applies in this way across multiple plaintiffs, rather than on a per-plaintiff basis. This lack of authority is no surprise, since Virginia law counsels strongly against that unprecedented interpretation. Original meaning demands a per-plaintiff interpretation of the cap: At the time the General Assembly enacted it, plaintiffs simply could not bring joint actions in the Commonwealth's courts. So do Virginia principles of statutory interpretation, which, among other things, require courts to consider legislative purpose and avoid absurd results when interpreting state statutes. Common sense,

too, requires a per-plaintiff application: If the cap applied across all plaintiffs in a given proceeding, plaintiffs would have every incentive to sue separately rather than jointly to maximize their recovery, burdening the state and federal courts with duplicative litigation. And persuasive case law from other jurisdictions—which have held that analogous statutory caps must be applied on a per-plaintiff basis—confirms the soundness of a per-plaintiff approach. The district court reached a contrary conclusion only by disregarding Virginia law and overextending *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 237 & n.10 (4th Cir. 2000), a case in which this Court expressly reserved judgment on the question at hand. Accordingly, the Court should reverse this portion of the district court's judgment.

In addition, the Court should reject Appellants' belated attack on the district court's finding of joint and several liability. Before the district court, Plaintiffs repeatedly argued that Defendants should be held jointly and severally liable. Appellants failed to dispute the issue despite the clear opportunity to do so and have therefore forfeited any challenge to the district court's finding on this point. But even if the Court were to consider Appellants' arguments, they fail on the merits. Appellants show no error whatsoever (let alone reversible error) in the district court's conclusion—based on well-established Virginia law—that they are jointly and severally liable for the damages the jury awarded in connection with the

conspiracy, including those resulting from the predicate acts of the conspiracy: a hate crime and assault and battery.

Accordingly, the Court should reverse the portion of the district court's judgment capping punitive damages at $350,000. In all other respects, the Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

On November 23, 2021, the jury returned a verdict in favor of Plaintiffs on their state law claims and awarded more than $26 million in damages. J.A. 4749-55. Defendants filed several post-trial motions between December 2021 and March 2022, and on December 30, 2022, the district court reduced the jury's award of punitive damages by over $23 million under its interpretation of Va. Code § 8.01-38.1. J.A. 4846. On March 9, 2022, Plaintiffs moved for default judgment against several Defendants who did not appear at trial. The district court granted this motion on January 6, 2023, but it denied Plaintiffs' request to assess additional punitive damages based on the court's interpretation of Va. Code § 8.01-38.1. J.A. 4860-61. The district court entered final judgment on January 9, 2023. J.A. 4865-68. On February 8, 2023, Plaintiffs filed a timely notice of appeal from the relevant portion of the district court's final judgment. J.A. 4872-75.

4

This Court has jurisdiction over the cross-appeal under 28 U.S.C. § 1291. Although Plaintiffs understand the district court's final judgment to have fully and finally disposed of all claims, out of an abundance of caution they have moved the district court (with Appellants' consent) for an indicative ruling to confirm this Court's jurisdiction. *See* ECF 1670.[1]

## STATEMENT OF THE ISSUES

I.      Whether the district court erred in holding that Va. Code § 8.01-38.1 required the combined award of punitive damages in this proceeding, across eight Plaintiffs' actions seeking punitive damages against all Defendants for what the jury determined to be egregious misconduct, to be capped at $350,000.

II.      Whether the Court should affirm the district court's determination—which Appellants failed to challenge in the district court—that Appellants are jointly and severally liable under Virginia law for the compensatory damages that the jury awarded for the predicate acts of the conspiracy.

## STATEMENT OF THE CASE

### A.     Factual Background

In 2017, hundreds of white supremacists, white nationalists, and neo-Nazis descended upon Charlottesville, Virginia to take part in the "Unite the Right" rally—or, as Defendants called it, the "Battle of Charlottesville." J.A. 4636; *see* J.A. 4620

---

[1] All ECF citations are citations to the district court docket.

(Defendant Jason Kessler stating, "I think we need to have a Battle of Berkeley situation in Charlottesville.").[2] Defendants spent months planning this event in the hope that it would spark a "race war." J.A. 3634:16-35:1.

Defendants, including Appellants, shared a profound hatred for religious and racial minorities, as the evidence at trial showed. They idolized Hitler, *see* J.A. 1372:16-24, 4608; admired *Mein Kampf*, *see* J.A. 1371:3-5, 2418:9-12; glorified violence against Black and Jewish people, *see* J.A. 2076:8-14, 2255:3-2256:2, 4397, 4542; and longed for a white ethno-state, *see* J.A. 4410 (Appellant Michael Hill on behalf of his organization, Appellant League of the South: "Dixie is and should be White Man's Land. We are firm on the Negro Question and the Jew Question."); J.A. 2256:1-2, 2259:23-24 (Appellant Michael Tubbs "agree[ing] with [Appellant] Hill" and "shar[ing] [Appellant] Hill's views"); J.A. 2791:2-9, 2799:3-2800:1 (Appellant Nathan Damigo testifying that he founded and led Defendant Identity Evropa to advocate for a white ethno-state); J.A. 4622-34 (Defendant Traditionalist Worker Party's "25 Point Plan"); *see also* J.A. 4540 (Hill: "I pledge to be a white supremacist, a racist, an anti-Semite, a homophobe, a xenophobe, an Islamophobe, and any other sort of 'phobe that benefits my people."). Through text messages,

---

[2] The "Battle of Berkeley" referred to a white nationalist event earlier in 2017 in which Appellant Nathan Damigo gained notoriety for punching a woman and knocking her down. *See, e.g.*, J.A. 1825:19-1827:1.

emails, and an online messaging platform called Discord, Defendants mobilized hundreds of white nationalists and white supremacists from across the country and set out to "gas the kikes," J.A. 3634:16-35:1, and "dominate the streets" of Charlottesville, J.A. 1824:14-17.

To achieve those ends, Defendants and their co-conspirators encouraged attendees to bring weapons and engage in violence under the guise of self-defense. *See, e.g.*, J.A. 2110:7-22 (Hill testifying that he approved the creation of shields for League of the South's "soldiers" that he knew could be used offensively); J.A. 4391 ("[I]t would be things, like, what can you bring that if you're caught with it, it would look like a defense weapon. What is it if—I think someone brought up, you know, bring a flagpole, but, then, like, tape a—like, have a knife tucked in it and, like, tape it in there or, you know, whatever, cauterize it if you need to."); J.A. 4530 (Tubbs: "I think we all assumed there would be [violence] (and maybe even hoped for it)."); J.A. 4616 ("If you want a chance to crack some Antifa skulls in self-defense don't open carry. You will scare the sh*t out of them and they'll just stand off to the side").

They even prepared to run counter-protestors over with cars. J.A. 4604, 4661 ("Is it legal to run over protestors blocking roadways?"); J.A. 4606 ("Introducing John Deere's New Multi-Lane Protestor Digestor"); J.A. 4621 (Defendant Christopher Cantwell: "Blocking traffic is not peaceful protest, and every person who reminds you of that without using his car, is giving you more slack than you

f\*\*king deserve."); J.A. 4765 (Damigo: "The lines between politics and violence is blurring. Welcome to 4th generational warfare."); J.A. 4764-65 (district court summarizing Defendants' statements "demonstrating that they shared expectations of, hoped for, planned for, and purposefully sought to instigate violence at Unite the Right").

Appellants were personally and actively involved in these violent and hateful plans. For instance, Hill, who founded and led League of the South, agreed to help Kessler recruit additional participants for Unite the Right, "offered" League of the South's participation, used Twitter to encourage members to attend, and was promoted on fliers alongside other Defendants. *See* J.A. 2078:3-2079:20, 2086:16-2087:3, 2114:3-2115:3, 4643; *see also* J.A. 4417 (Hill tweeting, "If you want to defend the South and Western civilization from the Jew and his dark-skinned allies, be at Charlottesville on 12 August."). Hill divided up Unite the Right organizing responsibilities among League of the South members and placed Tubbs "in command of general operations." J.A. 4528. Similarly, Damigo, who founded and led Identity Evropa, communicated regularly with other Unite the Right planners (including Defendant Richard Spencer) about the forthcoming event on calls, at parties, and via text messages. *See* J.A. 1877:12-1878:18, 1886:13-1888:5, 1911:12-1913:9. Damigo did not allow Identity Evropa members to engage in activism without express authorization from him or Defendant Elliot Kline (to whom Damigo

had delegated approval authority). *See* J.A. 2818:9-25. But Damigo granted Identity Evropa members permission to help organize and attend Unite the Right—and he personally approved equipment for them to wear, including shields, helmets, and gloves. *See* J.A. 2817:10-18, 2828:12-16, 2829:7-22.

Defendants then followed through on their plans. On a harrowing weekend in August 2017, they stormed Charlottesville and repeatedly committed acts of racially motivated violence against Plaintiffs and others. On Friday, August 11, Defendants (including League of the South members, some of whom wore League of the South uniforms, *see* J.A. 4418) marched through the University of Virginia campus alongside hundreds of neo-Nazis, wielding torches and chanting "Jews will not replace us" and "blood and soil." J.A. 1080:20-23. When they arrived at UVA's Thomas Jefferson statue, they encircled a group of peaceful counter-protestors (including two Plaintiffs), pinned them against the statue, and refused to let them leave, J.A. 4400, as a "sign of dominance," J.A. 1933:9-12. They threw torches and fluid at the counter-protestors, leading the counter-protesters to believe that they were going to be "burn[ed] . . . alive," J.A. 1089:15-19, and kicked, punched, pepper-sprayed, and verbally harassed the counter-protestors, J.A. 1084:20-1092:18.

The next morning, Spencer wrote an email celebrating the previous day's violence. He declared that August 11 was "only the prequel." J.A. 1940:14-20. Just as he and his co-conspirators had planned, the violence resumed and intensified on

August 12. Defendants and their foot soldiers (including Hill, Tubbs, and other League of the South members, as well as Damigo and other Identity Evropa members) rampaged through Charlottesville and unleashed a full-on attack against Plaintiffs and many others. They used fists, shields, flagpoles, clubs, and other weapons to attack peaceful counter-protesters. *See* J.A. 4575, 4617, 4829; *see also* J.A. 2519:4-9 (Defendant Matthew Parrott describing Tubbs as "an especially imposing League organizer" who "towered over and pushed through the Antifa like a Tyrannosaurus among raptors as League fighters with shields put their training to work"). They broke through the peaceful counter-protestors' lines, spat on them, knocked them down, and doused them with foul liquids. *See* J.A. 948:1-19. Their brutality culminated in Defendant James Fields driving his car into a group of counter-protestors, killing Heather Heyer and injuring many others, including many Plaintiffs.

Afterwards, Defendants hailed this bloodshed as a "moral" and "tremendous victory." J.A. 1967:14-17, 2527:10-14. Damigo called it a "huge success." J.A. 2836:21-23, 4763-64.[3] Other Defendants proclaimed that it was "an Honor to stand with [their co-conspirators] in C'ville," J.A. 4635, and (in Hill's words) that they

---

[3] At the same time, Damigo directed another member of Identity Evropa to shut down the organization's Discord server and "remind[]" its members "not to talk to the police." J.A. 4764 (noting that this was "evidence that Damigo sought to conceal Identity Evropa's role in planning of and participation in Unite the Right").

"would not go back and change a thing," J.A. 4412; *see also* J.A. 4416 (Hill tweeting, "League of the South had a good day in Charlottesville, Virginia. Our warriors acquitted themselves as men."); J.A. 4422 (Hill tweeting, "Tubbs will be the first to say that he fought beside many brave warriors that day," and praising Tubbs for being "everywhere the chaos was"). They vowed to come back to Charlottesville "every f**king weekend." J.A. 4802. They expressed no remorse for the life they took and the numerous lives they permanently altered, including those of the Plaintiffs. And they celebrated Fields as a martyr. For example, Tubbs said Fields "did nothing wrong," J.A. 4405; Defendant Matthew Heimbach referred to Fields as a prisoner of war, J.A. 1543:7-25; and Defendant Vanguard America sent Fields Christmas cards in prison, J.A. 2910:8-10. When Cantwell saw Fields after they were both arrested, Cantwell gave Fields a Nazi salute and a hug. J.A. 3668:18-24.

But for Plaintiffs, the events of August 11 and 12 were beyond their worst nightmares. As a result of Defendants' wanton violence, Plaintiffs suffered grievous injuries, both physical and emotional. For example, the evidence showed that on August 11, several Defendants and their co-conspirators verbally harassed Devin Willis with hateful statements and racist monkey noises and kicked, punched, and pepper sprayed him. The next day, they pepper sprayed him and knocked him down, causing him to experience anxiety and depression. *See* J.A. 1080:20-1085:11, 1088:7-1095:2, 1115:13-1118:12, 1134:24-1142:17, 3277:16-25. A group of

11

Defendants and their co-conspirators maced and verbally harassed Natalie Romero, too, on August 11. The next day, after she was shoved and spit on, Fields' car attack fractured her skull and caused her to experience a severe concussion, a shattered tooth root, a lip laceration, cuts and bruises, anxiety, and PTSD. *See* J.A. 933:17-938:21, 949:3-952:21, 957:4-979:17, 980:25-984:5, 985:25-986:21, 3277:16-3278:3, 4354-55, 4668, 4828. The other Plaintiffs who sought punitive damages (Marcus Martin, Marissa Blair, Thomas Baker, Chelsea Alvarado, Elizabeth Sines, and April Muñiz), as well as Plaintiff Seth Wispelwey (the lone Plaintiff who did not seek punitive damages), also suffered serious injuries at the hands of Defendants and their co-conspirators. These Plaintiffs' injuries included bone fractures, ligament damage, traumatic brain injury, concussions, lacerations, and lasting mental and emotional harms.[4]

## B.   District Court Proceedings

Plaintiffs filed suit in the Western District of Virginia on October 11, 2017, seeking compensation for their injuries. Plaintiffs alleged (among other claims) federal civil-rights and conspiracy claims (Counts I and II); a Virginia state-law civil

---

[4] *See, e.g.*, J.A. 2645:9-2655:1, 2657:14-2658:2, 3277:16-3278:3, 4650-52, 4666, 4828 (Marcus Martin); J.A. 2308:23-2315:13, 2316:13-2317:10, 2318:4-2320:6, 4828 (Marissa Blair); J.A. 2206:11-2218:25, 2221:20-2223:8, 4640-42, 4644, 4665, 4828 (Thomas Baker); J.A. 2381:18-2388:22, 2394:10-2398:14, 3277:16-3278:3, 4646-49, 4667, 4828 (Chelsea Alvarado).

conspiracy claim (Count III); a Virginia state-law claim for racial, religious, or ethnic harassment under Va. Code § 8.01-42.1 (Count IV); and Virginia state-law tort claims for assault and battery (Count V) and intentional infliction of emotional distress (Count VI). *Cf.* J.A. 246-54, 4746-55.

The jury trial spanned twenty-two days, beginning on October 25, 2021, and concluding on November 23, 2021. J.A. 257, 4755, 4758. By the district court's count, the parties admitted 917 trial exhibits, and 35 witnesses testified before the jury in person or by deposition. J.A. 4758.

After deliberating, the jury unanimously decided for Plaintiffs on their state claims and did not reach a verdict on the federal claims. J.A. 4746-55. The jury awarded over $26 million in damages, including more than $2 million in compensatory damages across all nine Plaintiffs and an additional $24 million in punitive damages to the eight Plaintiffs who sought punitive damages. J.A. 4749-55, 4759-60.

Several Defendants, including Appellants, filed a flurry of post-trial motions seeking to set aside the jury's findings on liability and damages. As relevant, Damigo moved for a directed verdict on Counts I, II, and III, arguing that Plaintiffs failed to introduce sufficient evidence of an unlawful agreement, conduct that was more than merely "innocuous," or foreseeable damage; he further contended that the jury's punitive damages award should be reduced. J.A. 4761-62, 4831. Hill, Tubbs, and

League of the South also moved for a directed verdict on Counts I, II, and III, arguing that Plaintiffs failed to introduce sufficient evidence of these Appellants' participation in the conspiracy to commit racially motivated violence; that Fields' car attack was not an act in furtherance of the conspiracy; that certain Plaintiffs purportedly failed to show that the conspiracy caused certain Plaintiffs' injuries; and that the punitive damages award was defective. J.A. 4807-08, 4812. Several Defendants also contended that Va. Code § 8.01-38.1 required that the district court reduce the jury's award of punitive damages to $350,000.

Plaintiffs, meanwhile, filed a post-trial motion for default judgment against the Defendants who had defaulted on the pleadings and sought a court order confirming that all Defendants would, under Virginia law, be held jointly and severally liable for the compensatory damages awarded by the jury on Counts III (the state-law civil conspiracy claim), IV (the predicate hate-crime statutory claim), and V (the predicate assault and battery claim). *See* ECF 1554 at 18-19. None of the Defendants, including Appellants (all of whom were served with Plaintiffs' motion), opposed either request. Plaintiffs again raised the issue of joint and several liability in opposing Defendants' post-trial motions challenging the punitive damages award, arguing that a proper assessment of this award required aggregating compensatory damages across all Defendants. *See* ECF 1572 at 18-19. As Plaintiffs explained again, under Virginia law, co-conspirators are jointly and severally liable for all

14

damages resulting from the conspiracy, including all acts taken in furtherance of the conspiracy. *Id.* Appellants again did not rebut this argument. *See generally* ECF 1593 (Damigo's reply brief).

On December 30, 2022, the district court—having presided over the case for over five years, including the lengthy and complex jury trial—decisively rejected nearly all of the Defendants' attempts to disturb the verdict. In particular, in a detailed and thorough order, the district court rebuffed the Defendants' assertions that there was insufficient evidence of their participation in the unlawful conspiracy and otherwise rejected their attempts to undermine the jury's verdict. J.A. 4760-4814.

The district court, however, ruled for the Defendants on one legal issue of great consequence. In the court's view, Va. Code § 8.01-38.1 mandated that the jury's award of $24 million in punitive damages be capped at a combined $350,000 across the eight Plaintiffs who sought punitive damages. *See* J.A. 4825, 4846. Seven days later, the court extended this holding and declined to assess additional punitive damages against several defaulted Defendants. *See* J.A. 4856-57, 4860-61.

The district court rejected Plaintiffs' argument that the text, history, and clear purpose of the punitive damages cap showed that it was intended to reach run-of-the-mill tort lawsuits and that it did not extend to violations of Virginia's hate-crime statute. *See* J.A. 4816-18. The court also rejected Plaintiffs' argument that, even if

15

the cap applied to Defendants' egregious misconduct, it should apply on a per-plaintiff basis. The district court acknowledged that this Court expressly "left th[is] issue open" in *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 237 n.10 (4th Cir. 2000), but nevertheless found that the "reasoning in *Al-Abood* . . . strongly indicate[d] that Virginia's cap" applied to the proceeding as a whole rather than to each Plaintiff's joined action. J.A. 4819-20. The district court also distinguished an analogous Virginia medical malpractice cap that applied on a per-plaintiff basis; dismissed Plaintiffs' constitutional avoidance arguments; rejected persuasive authority from other states; and deemed irrelevant Virginia's strong public policy favoring judicial efficiency and joinder. *See* J.A. 4820-24. In support of its interpretation, the court relied on dicta in one unpublished federal case and an unpublished state trial court case in which the issue was not raised. *See* J.A. 4824 & nn.27, 28.

After dramatically reducing the jury's punitive damages award based on this analysis, the district court rejected Defendants' challenges to the constitutionality of the punitive damages award. J.A. 4825-43. Referring to evidence of Defendants' heinous conduct leading up to and during the Unite the Right event, the district court concluded that the trial evidence showed that "Defendants' conduct far exceeds the standard of conduct deemed reprehensible in the courts," which entitled the jury "to conclude that Defendants acted reprehensibly such as to support a sizeable award of

16

punitive damages." J.A. 4830. The district court then determined that the punitive damages ratio was permissible. In doing so, the court agreed with Plaintiffs' unrebutted arguments that Defendants were jointly and severally liable for the damages caused by the conspiracy. J.A. 4831-33.

On January 6, 2023, the district court ruled on Plaintiffs' motion for default judgment. The court concluded that all the defaulted Defendants were liable on Count III and that defaulted Defendant Invictus was liable on Count IV. J.A. 4850. The court explained that Plaintiffs had pleaded claims for civil conspiracy in violation of Virginia law, including a conspiracy to commit racial violence in violation of Va. Code § 8.01-42.1. J.A. 4850-55 (detailing extensive allegations describing the unlawful conspiracy). Applying settled principles of Virginia conspiracy law, the court reiterated that all Defendants, including the defaulted Defendants, were jointly and severally liable for the compensatory damages award on Counts III, IV, and V. J.A. 4856.

After the district court entered final judgment on January 9, 2023, seven Defendants filed five notices of appeal, and Plaintiffs filed a timely notice of cross-appeal.[5] This Court consolidated the appeal dockets for Appellants Hill, Tubbs, and

---

[5] Because the district court entered final judgment and closed the case, Plaintiffs (and the seven Defendants who appealed) proceeded on the understanding that the district court's judgment disposed of remaining Counts I and II. *See* J.A. 4868; *see also, e.g.*, ECF 1660 (awarding attorney's fees at conclusion of proceedings).

17

League of the South (No. 23-1119) and Appellant Damigo (No. 23-1122) with this cross-appeal docket (No. 23-1154).[6]

## SUMMARY OF THE ARGUMENT

**I.**    Several decades ago, the Virginia General Assembly passed legislation limiting punitive damages in run-of-the-mill tort cases to ensure predictability and stability for the insurance industry. *See* Va. Code § 8.01-38.1 (1987). The district court mistakenly applied this statutory cap to the Defendants' egregious violations of Virginia's hate-crime statute. Under Virginia law, that was error. As the text and purpose of Va. Code § 8.01-38.1 demonstrate, the cap does not apply to actions involving the hate-crime statute. This Court should therefore reverse the district court's application of the cap and its limit on Plaintiffs' recovery against Defendants.

But even if the cap applied in this extraordinary case, the district court should have applied it on a per-plaintiff basis (instead of applying it across all Plaintiffs in

---

Nevertheless, out of an abundance of caution, and to assure this Court of its own appellate jurisdiction, Plaintiffs have filed a motion for an indicative ruling in the district court. That motion asks the district court, with Appellants' consent, to (1) confirm the parties' understanding that Counts I and II already have been dismissed, (2) dismiss with prejudice Counts I and II under Federal Rule of Civil Procedure 41, or (3) enter final judgment under Rule 54(b) on Counts III-VI and certify that there is no just reason for delay, given Plaintiffs' waiver of a re-trial on Counts I and II. *See* ECF 1670.

[6] The three *pro se* appeals, which are not consolidated, also remain pending: Nos. 23-1112 (Spencer), 23-1123 (Defendant Jeff Schoep), and 23-1125 (Cantwell). Informal briefing in each of these matters has been completed.

this proceeding). Original meaning, bedrock canons of statutory interpretation, constitutional concerns, and persuasive authority interpreting analogous statutes in other jurisdictions all compel the same conclusion: If the punitive damages cap applies to this proceeding at all, it should be applied on a per-plaintiff basis. Accordingly, the Court should (at minimum) reverse the district court's ruling applying the cap across all Plaintiffs and remand with instructions to apply the cap on a per-plaintiff basis.

**II.**    This Court should affirm the district court's determination that Appellants are jointly and severally liable for the compensatory damages that the jury awarded on Counts III, IV, and V.

*First*, Appellants have forfeited their right to challenge the district court's ruling on joint and several liability. In their post-trial briefing, Plaintiffs (repeatedly) argued that, as co-conspirators, Defendants must be held jointly and severally liable for the compensatory damages awarded in connection with the conspiracy and the predicate acts of that conspiracy. In response, Appellants did not dispute that they were jointly and severally liable under Virginia law, nor did they present to the district court any of the arguments they now press on appeal. This Court should reject Appellants' belated efforts to raise arguments that should have been raised in the district court.

*Second*, even if Appellants' arguments on joint and several liability were properly preserved, they fail on the merits. Appellants have shown no error in the district court's determination that Virginia law renders them, as co-conspirators, jointly and severally liable for compensatory damages on Counts III, IV, and V. As the verdict demonstrates, the jury found Appellants liable for conspiracy under Virginia law (Count III) and further found that their co-conspirators had committed each of the two predicate acts of the conspiracy (Counts IV and V). Consistent with this finding, the jury's award of compensatory damages on Counts III, IV, and V reflects the jury's effort to avoid double recovery by the Plaintiffs. Applying black-letter Virginia law to the verdict, the district court correctly confirmed that joint and several liability attached to the compensatory damages award on these counts.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews the district court's interpretation of state law *de novo*. *See, e.g.*, *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991); *Farm Labor Org. Comm. v. Stein*, 56 F.4th 339, 346 (4th Cir. 2022). This Court must affirm "a district court's decision confirming a jury's award of compensatory damages unless the verdict was contrary to the clear weight of the evidence, was based on false evidence, or would result in a miscarriage of justice." *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 199 (4th Cir. 2017).

## II.  VIRGINIA'S STATUTORY CAP ON PUNITIVE DAMAGES DOES NOT SUPPORT THE DISTRICT COURT'S REDUCTION OF THE JURY AWARD

Several decades ago, the Virginia General Assembly passed legislation to limit recovery of punitive damages. *See* Va. Code § 8.01-38.1 (1987). The text of that statute provides:

> In any action accruing on or after July 1, 1988, including an action for medical malpractice under Chapter 21.1 (§ 8.01-581.1 et seq.), the total amount awarded for punitive damages against all defendants found to be liable shall be determined by the trier of fact. In no event shall the total amount awarded for punitive damages exceed $350,000. . . . [I]f a jury returns a verdict for punitive damages in excess of the maximum amount specified in this section, the judge shall reduce the award and enter judgment for such damages in the maximum amount provided by this section.

The district court applied this cap to Defendants' egregious, hateful, and deadly conduct, thereby reducing the jury's punitive damages award from $24 million to $350,000 across all Plaintiffs. This unsettling result should be reversed for two independent reasons. *First*, the district court's reduction of punitive damages collides with the text and purpose of the statute, which establish that the cap does not limit recovery for violations of Virginia's hate-crime statute. *Second*, even assuming the cap properly applies to proceedings involving Virginia's hate-crime statute, the district court erred by failing to apply it on a per-plaintiff basis.

21

A.     **The Punitive Damages Cap Does Not Apply to Defendants'
       Egregious Conduct Involving Violations of Virginia's Hate-Crime
       Statute.**

The district court held that the punitive damages cap applies to the jury's

verdict in these hate-crime proceedings. *See* J.A. 4816-18. That conclusion was

mistaken. Plaintiffs' counsel has been unable to find any case holding that the

punitive damages cap applies to proceedings involving Virginia's hate-crime statute.

And neither the district court nor the Defendants have identified any contrary

authority. This lack of precedent is no surprise because the text and purpose of the

punitive damages statute confirm that it does not apply to such proceedings.

Start with the text, which shows that the General Assembly had a particular

set of concerns in mind. It is well established that words are known by the company

they keep (a principle of statutory interpretation often referred to as "*noscitur a

sociis*"). *See Andrews v. Ring*, 585 S.E.2d 780, 784 (Va. 2003); *S.D. Warren Co. v.

Me. Bd. of Env't Prot.*, 547 U.S. 370, 378 (2006). And here, the statute's use of the

term "action" keeps very specific company: "an action for medical malpractice." Va.

Code § 8.01-38.1. This statutory language demonstrates that the cap was intended to

cover run-of-the-mill tort claims, such as medical malpractice claims—not a civil

rights proceeding brought by several plaintiffs alleging a conspiracy to commit

racially motivated hate crimes.

22

The statute's purpose and enactment history cement this understanding. When interpreting Virginia statutes, courts must follow the "mischief rule," a core principle of state law that the district court overlooked. The mischief rule dictates that every statute must be interpreted to "promote the ability of the enactment to remedy the mischief at which it is directed," *Bulala v. Boyd*, 389 S.E.2d 670, 674 (Va. 1990), and must "be construed to accomplish [its] purpose," *In re Webb*, 214 B.R. 553, 556 (E.D. Va. 1997). This principle "will more often than not suggest a narrower reading for the statute." Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 1005 (2021); *see also id.* at 1000 (collecting cases); 2B Sutherland Statutory Construction § 54:4 (7th ed.) (collecting cases).

The mischief rule holds true even when the statutory text may appear to be clear on its face. *See, e.g.*, *Rector & Visitors of Univ. of Virginia*, 387 S.E.2d 772, 774-76 (Va. 1990) (reading statute authorizing courts to reduce or apportion certain liens to further authorize courts to divide and distribute any recovery among contending parties); *Norfolk Southern Ry. Co. v. Lassiter*, 68 S.E.2d 641, 642-46 (Va. 1952) (interpreting statute regulating steam locomotives to apply to diesel locomotives as well, given legislative purpose of reducing injuries and deaths at grade crossings). And the 400-year-old rule "retains its vitality" even today. *Bd. of Supervisors of King & Queen Cnty. v. King Land Corp.*, 380 S.E.2d 895, 897 (Va.

1989); *accord Manu v. GEICO Cas. Co.*, 798 S.E.2d 598, 608 (Va. 2017) (citing

*Board of Supervisors* and applying mischief rule).

Applied here, the mischief rule establishes—consistent with the statutory

text—that the cap does not limit punitive damages in cases centered on violations of

the hate-crime statute. The General Assembly enacted the cap as part of legislative

tort reform with a particular aim: to enable insurance companies to estimate more

readily the dollar amount of claims possibly required by personal injury lawsuits.

*See* The Liability Insurance Crisis and the Need for Tort Reform, Report to the

Governor and the General Assembly of Virginia at 4-5, 7-8, S. Doc. No. 11 (1987),

https://rga.lis.virginia.gov/Published/1987/SD11/PDF; *see also Wackenhut Applied*

*Techs. Ctr., Inc. v. Sygnetron Prot. Sys., Inc.*, 979 F.2d 980, 984 (4th Cir. 1992)

(discussing purpose of bill).[7]

---

[7] *See also, e.g.*, Michael Hardy, *Senate Gets Jitters Before Backing Tort Package*, Richmond Times-Dispatch, Feb. 10, 1987, at A-6 ("The Senate endorsed a 'tort reform' package yesterday . . . . Its sponsors predict the limitation on dollar recovery would reduce rates charged by insurance companies."); Jeanne Cummings, *Damage Cap Compromise Being Forged*, Richmond Times-Dispatch, Feb. 20, 1987, at 5 ("The [punitive damages] cap is the only element remaining in limbo of a *package of bills aimed at reducing insurance premium rates* and making insurance more available." (emphasis added)); Betty Booker & Dale Eisman, *Focus on Limits in Injury Awards May Be Shifted*, Richmond Times-Dispatch, Feb. 20, 1987, at A-9 ("The industry is pushing for a limit on damage awards in an effort to lower costs and to slow the rapid increase in liability premiums.").

These authorities all reinforce what this Court has already acknowledged: a central "goal" of the punitive damages cap was to ensure predictability and stability for the insurance industry. *Wackenhut*, 979 F.2d at 985. And more broadly, the General Assembly's concern was—and remains—addressing payouts for garden-variety torts involving "awards that burden the state's economy." *Id.*

In contrast, the General Assembly could not have contemplated, let alone intended, that the statutory cap on punitive damages would apply in hate-crime proceedings, especially in a historic case like this one. Indeed, the General Assembly took pains to make clear that prevailing civil rights plaintiffs are entitled to punitive damages for actions brought under the hate-crime statute. *See* Va. Code § 8.01-42.1(B) ("Any aggrieved party who initiates and prevails in an action authorized by this section *shall be entitled* to damages, including punitive damages . . . ." (emphasis added)). Here, all Plaintiffs established that seventeen Defendants conspired to commit heinous acts of racial and religious violence, including violations of the hate-crime statute, and brazenly executed that conspiracy over the course of two days. *See* J.A. 4749-53. Holding neo-Nazis, white nationalists, and white supremacists accountable for their bigoted violence would not burden the Commonwealth's economy, materially affect insurance premiums, or disrupt the stability of the insurance industry.

In addition, applying the punitive damages cap in these circumstances would undermine the General Assembly's goals in enacting the hate-crime statute that Defendants violated. The General Assembly did not pass the Virginia hate-crime statute until 1988, a year after it enacted the punitive damages cap. The hate-crime statute was designed by a joint subcommittee that the General Assembly created to study hate in Virginia due to concerns about increased "violence motivated by racial, ethnic or religious hatreds." 1987 Va. Acts 1767. The General Assembly expressly charged the subcommittee with "ensur[ing] adequate compensation of the victims" of such violence. *Id.* To fulfill that mandate, the subcommittee crafted the hate-crime statute, which (as noted) expressly provides that a prevailing plaintiff is entitled to damages, "including punitive damages," attorney's fees, and costs. Va. Code § 8.01-42.1(B). It is therefore no surprise that no party (nor the district court) could find a single case applying the cap to proceedings involving the hate-crime statute or under any other circumstances remotely resembling those present here.

The district court broke new ground when it rejected this commonsense reading of the statutory cap. The court appeared to rest its novel holding on two bases: this Court's decision in *Wackenhut* and the statute's use of the word "any" before "action." *See* J.A. 4816-18. But neither bears the weight placed upon it.

Take *Wackenhut*, for starters. Upon analyzing the statutory text and legislative history, *Wackenhut* rejected the notion that the cap applied only to unintentional tort

26

actions. *See* 979 F.2d at 984. That holding (unlike the district court's holding) is entirely consistent with the statutory text and Virginia's mischief rule. *Wackenhut* concerned allegations of "breach of contract and a number of tortious interferences with . . . business relationships." *Id.* at 982. It is difficult to imagine a context more likely to generate the precise mischief of "burden[ing] the state's economy" that the General Assembly sought to remedy when it capped punitive damages awards in actions involving such claims. *Id.* at 985. In contrast, it is utterly implausible that the Legislature viewed punitive damages awards involving violations of Virginia's hate-crime statute as having a similar effect, especially considering that the General Assembly ensured that prevailing plaintiffs would be entitled to punitive damages awards under the hate-crime statute.

Nor is the General Assembly's use of the word "any" in the punitive damages statute dispositive. To be sure, the word "any" may sometimes support a broad reading of a statute. But "whether it does so necessarily depends on the statutory context." *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 629 (2018); *see Sellers v. Bles*, 92 S.E.2d 486, 490-91 (Va. 1956) (applying *noscitur a sociis* principle and interpreting statutory phrase "any improvement" narrowly). Here, the statutory context necessarily includes Va. Code § 8.01-38.1's express reference to medical malpractice actions and—given Virginia's adherence to the mischief rule—its clear purpose. In light of that context, "the word 'any' in this context does not

27

bear the heavy weight the [district court] put[] upon it." *Nat'l Ass'n of Mfrs.*, 138 S.

Ct. at 629.

Virginia canons of statutory interpretation establish that the punitive damages

cap applies to tort litigation like malpractice claims that affect the state's economy,

not civil rights actions against defendants who committed hate crimes. The Court

should therefore reverse the district court's misapplication of the cap, including its

refusal to assess additional punitive damages against the defaulted Defendants. *See*

J.A. 4856-57.

> **B.    Even if the Punitive Damages Cap Applied Here, the District Court's Refusal to Apply It on a Per-Plaintiff Basis Would Require Reversal.**

As explained above, the text and purpose of Va. Code § 8.01-38.1 confirm

that its limitation on punitive damages does not apply to civil rights claims involving

the hate-crime statute. But even if the cap were applicable to hate-crime cases and

reached Defendants' heinous acts of racial and religious violence, it would not and

could not apply in as sweeping a manner as the district court believed. At the very

least, the punitive damages cap would apply only on a per-plaintiff basis—which

means that *each* of the Plaintiffs entitled to such damages would receive a punitive

damages award in the maximum amount of $350,000.

The limitation on punitive damages applies specifically to an "action" that

accrues after the effective date of the statute. Va. Code § 8.01-38.1. The statute

expressly limits the "total amount awarded for punitive damages against *all defendants*." *Id.* (emphasis added); *see Al-Abood*, 217 F.3d at 236-37. But the statute is silent on the separate question of how it applies in multi-*plaintiff* proceedings. This Court has reserved judgment on that issue of first impression. *See id.* at 237 n.10 ("We express no opinion on how the cap would be applied in a case involving multiple plaintiffs."). Tellingly, Defendants and the district court have not identified a single case—state or federal, trial or appellate, precedential or unpublished—in which any court has squarely rejected a per-plaintiff interpretation of the statute. In fact, the *only* decision endorsing that surprising proposition is the district court's ruling.

This dearth of authority is no accident. Original meaning, Virginia canons of statutory interpretation, constitutional avoidance concerns, and persuasive authority from other jurisdictions all demonstrate that the statute's use of the term "action" refers to the individual "action" of each plaintiff separately, not to the overall multi-plaintiff proceeding. So, if the statutory cap applies at all in this case, it applies on a per-plaintiff basis. The district court's contrary determination should be reversed.

1. *Original meaning and general principles of joinder support a per-plaintiff interpretation.*

The original meaning of "action," as used in the punitive damages statute and in the context of Virginia law, unquestionably referred to an individual plaintiff's suit. That is because at the time Va. Code § 8.01-38.1 was enacted, multiple plaintiffs

could not litigate together in the Commonwealth's courts. Were there any ambiguity, general principles of joinder would confirm the point.

Virginia law offers a generic definition of the word "action." Va. Code § 8.01-2(1) (defining "[a]ction" and "suit" to include "civil proceedings whether upon claims at law, in equity, or statutory in nature and whether in circuit courts or district courts"). But nothing in that definition clarifies whether the term means the "action" of each plaintiff separately, or the proceeding in which those separate actions have been joined and filed.

Although there is powerful authority that "action" ordinarily means the former (*i.e.*, the action of a single plaintiff),[8] the General Assembly has used the term interchangeably to refer to either concept—sometimes in the very same statute. For example, it has imposed a cap on "the total amount" recoverable in an "action" for medical malpractice. *See* Va. Code § 8.01-581.15. And when multiple plaintiffs join in the same malpractice proceeding, this cap applies separately to each plaintiff with an independent claim. *See Bulala*, 389 S.E.2d at 676. Similarly, Virginia's hate-crime statute—the heart of this proceeding—ties an "action" to an individual

---

[8] *See, e.g.*, *Action*, Black's Law Dictionary (5th ed. 1979) (defining "action" as "[t]he legal and formal demand of *one*'s right from another person or party made and insisted on in a court of justice" and an "ordinary proceeding in a court of justice, by which *one party* prosecutes another for the enforcement or protection of a right, the redress or prevention of a wrong" (emphases added)).

"person" or "party": It states that "[a]n *action* for injunctive relief or civil damages, or both, shall lie for *any person* who is subjected to acts" of racial or religious intimidation or violence, and that "[a]ny aggrieved *party* who initiates and prevails *in an action* authorized by this section shall be entitled to damages, including punitive damages." Va. Code § 8.01-42.1 (emphases added). And Virginia's joinder of claims statute provides that "[i]n *any civil action*, *a party* may plead as many matters . . . as *he* shall think necessary." Va. Code § 8.01-272 (emphases added). On the other hand, the plaintiff-joinder statute refers interchangeably to a multi-plaintiff proceeding as either "a single action" or "the actions so joined." Va. Code § 8.01-267.5.

Thus, interpreting the punitive damages cap requires understanding how the General Assembly used the word "action" in this statute—an inquiry that the district court did not attempt. Original meaning provides a clear answer, which general principles of joinder confirm: The enacting General Assembly used the term "action" to refer to the individual "action" of each plaintiff separately.

When the General Assembly enacted the punitive damages cap in 1987, Virginia permitted modern joinder of *defendants* in civil litigation, but adhered to a much stricter common law rule for joinder of *plaintiffs*. *See, e.g.*, *Parrish v. Hicks*, 28 Va. Cir. 475, 478 (1992), https://cite.case.law/va-cir/28/475 (explaining that although "the [state] Supreme Court and the legislature ha[d] significantly modified

the practices of nonjoinder and misjoinder of parties and actions," they had "deci[ded] . . . not to tamper with the rule on misjoinder of parties plaintiff").[9] For example, in *Parrish*, the state trial court held that spouses who were both passengers in the same vehicle and injured in the same car crash were misjoined as plaintiffs. *Id.* at 475-76. As a result, courts and litigants understood that plaintiffs had to sue separately, even if they were injured by the same act. Only in 1995 did the General Assembly abrogate this rule by enacting the Multiple Claimant Litigation Act ("MCLA"), a provision of which authorizes joinder of six or more plaintiffs under a standard analogous to Federal Rule of Civil Procedure 20. *See* Va. Code § 8.01-267.5.

 This history shows that the district court's multi-plaintiff interpretation is irreconcilable with the original meaning of the punitive damages cap. When the

---

[9] *See also, e.g.*, Rep. of Comm. on Mass Claims Litig., at 85 (Oct. 11, 1993), https://www.vba.org/page/boyd_graves (explaining that "Virginia by statute allow[ed] parties to plead multiple matters . . . and alternative facts and theories of recovery against alternative parties" so long as those claims arose out of the same transaction or occurrence, but "[t]wo or more [plaintiffs] who ha[d] separate interests and sustain[ed] separate damage [had to] sue separately, even if their injuries were caused by the same act" (citing Va. Code §§ 8.01-272, 8.01-281; 14A M.J. Parties § 17 (1989); *Parrish*, 28 Va. Cir. 475)); *Ortiz v. Barrett*, 278 S.E.2d 833, 835, 838 (Va. 1981) (noting misjoinder of plaintiffs when four guest passengers in the same car, injured by the same accident, jointly pursued personal injury litigation); *Rasnick v. Pittston Co.*, 5 Va. Cir. 336 (1986) ("At common law parties could not be joined unless their interests were joint," and "[t]here is no statutory law in Virginia on this question.").

General Assembly enacted this statute, it was legislating in view of the common law, not any statutory plaintiff-joinder standard. *See, e.g.*, *Burns v. Bd. of Supervisors of Stafford Cnty.*, 315 S.E.2d 856, 860 (Va. 1984) (explaining that the General Assembly is presumed to be aware of decisions of the Virginia Supreme Court, including common law decisions). And against that common law backdrop, the term "action" was unquestionably understood on a per-plaintiff basis, since in the Commonwealth's own courts, it was impossible for the term to refer to multiple plaintiffs.[10] This is compelling evidence in support of a per-plaintiff interpretation of the cap. *Cf. Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1750 (2020) (explaining that even where the plain meaning of a statutory term has evolved, "the law's ordinary meaning at the time of enactment usually governs").

To be sure, Rule 20 allows for multi-plaintiff litigation in federal courts even if it is unavailable in state court. But this federal procedural rule could not compel a different interpretation of the punitive damages cap because statutes are not "chameleon[s]" whose words are subject to "variable meanings" from one dispute or forum to another. *See United States v. Simms*, 914 F.3d 229, 242 (4th Cir. 2019) (en banc) (quoting *Clark v. Martinez*, 543 U.S. 371, 382 (2005)).

---

[10] In fact, a multi-plaintiff interpretation cannot be squared with Virginia joinder law even *today*, at least as to litigation involving two to five plaintiffs, who still cannot bring their actions together in the Commonwealth's courts. *See, e.g.*, *Cawlo v. Rose Hill Rsrv. Homeowners Ass'n, Inc.*, 106 Va. Cir. 235, 244 (2020).

Moreover, a per-plaintiff understanding of the term "action" in the punitive damages cap aligns with broader principles of joinder within and beyond Virginia. When multiple plaintiffs join in a single proceeding under either Federal Rule of Civil Procedure 20 or Virginia's MCLA, each plaintiff's "action" remains separate and distinct. Although this so-called "joinder" of actions enables "parties with similar substantive claims" to jointly assert their rights, it is a "procedural device" that does not affect—let alone diminish—the substance of those claims or rights. *See Saval v. BL Ltd.*, 710 F.2d 1027, 1030 (4th Cir. 1983); *Livingston v. Cnty. of Fairfax*, No. 08-cv-8875, 2009 WL 7339863, at *5 (Va. Cir. Ct. Apr. 28, 2009) (describing MCLA as imposing "procedural requirements"); 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1652 (3d ed. 2023) ("[R]ights that are separate and distinct under the governing law are not transformed into joint rights when plaintiffs join" together and bring a single proceeding; rather, "each plaintiff's right of action remains distinct, as if it had been brought separately.").[11] Under Virginia law, punitive damages are "substantive in nature,"

---

[11] *Accord, e.g.*, Moore's Federal Practice—Civil § 20.02 (2022) ("[S]ubstantive rights of the parties remain separate and are treated as though sued on separately."); *Hohlbein v. Heritage Mut. Ins. Co.*, 106 F.R.D. 73, 78 (E.D. Wis. 1985) ("The Rule regarding permissive joinder of parties is wholly procedural in nature and does not create nor alter the substantive rights of the parties."); *Moore v. Rohm & Haas Co.*, 497 F. Supp. 2d 855, 859 (N.D. Ohio 2007) (quoting Federal Practice and Procedure § 1652 ) (similar); *Gen. Inv. Co. of Conn. v. Ackerman*, 37 F.R.D. 38, 41 (S.D.N.Y. 1964) (similar).

*Barbara v. Adams*, 40 Va. Cir. 557, 557-58 (1994) (collecting cases), so each plaintiff's right to such damages remains distinct even after joinder.

Taken together, these principles confirm that joinder preserves each plaintiff's substantively separate action for purposes of Va. Code § 8.01-38.1 and that the statute's $350,000 limit on punitive damages (if it applies at all) applies individually to each plaintiff's distinct action.

### 2. *Virginia canons of statutory interpretation support a per-plaintiff interpretation.*

At least four Virginia canons of statutory interpretation confirm what the original understanding of Va. Code § 8.01-38.1 already makes clear.

*First*, Virginia's interpretive rule against surplusage counsels in favor of a per-plaintiff reading. Virginia law provides that courts "do not consider actions of the General Assembly to be superfluous" but rather "seek to provide meaning to all the words of a statute." *Commonwealth v. Squire*, 685 S.E.2d 631, 634 (Va. 2009); *see also, e.g.*, *Yamaha Motor Corp., U.S.A. v. Quillian*, 571 S.E.2d 122, 127-28 (Va. 2002) (rejecting interpretation that "effectively would render" a portion of the statute "superfluous," contravene legislative intent, and invite absurd outcomes). The district court reasoned that Va. Code § 8.01-38.1's reference to "the total amount awarded for punitive damages" in "any action" unambiguously covered the whole of a proceeding—all plaintiffs and all defendants. *See* J.A. 4819-20. But if that were so, the General Assembly's specification that this "total amount" covered the award

35

against "*all defendants*," Va. Code § 8.01-38.1 (emphasis added), would be utterly superfluous. In contrast, a per-plaintiff reading gives effect to every word in the statute, including the defendant-focused language that clarifies its scope.

*Second*, and relatedly, Virginia courts have cautioned that "courts cannot, by judicial interpretation, add language to a statute that the General Assembly did not include in its enactment." *Young v. Commonwealth*, 643 S.E.2d 491, 494 (Va. 2007). The district court violated this foundational principle by inserting a multi-plaintiff limitation into the statute. If the General Assembly had wanted to enact a multi-plaintiff cap, it could easily have capped the amount of punitive damages awarded "*to all plaintiffs*." Indeed, it clearly knew how to impose such a directive, given that it did so for "all defendants." A per-plaintiff reading respects the General Assembly's choice not to include such language.

*Third*, the mischief rule (discussed *supra* in Part II.A) strongly supports a per-plaintiff reading of the cap. As noted above, history leaves no doubt that the cap was designed to curb the economic unpredictability and instability inflicted on the insurance industry by runaway damages awards in garden-variety tort suits, such as those involving ordinary personal injury or malpractice claims. A per-plaintiff interpretation would offer precisely the predictability and stability the Legislature acted to ensure, as it would limit insurers' liability for punitive damages as to each injured plaintiff. Thus, the General Assembly and Virginia state courts have applied

the similarly motivated medical malpractice damages cap only on a per-plaintiff basis. *See* Va. Code § 8.01-581.15; *Bulala*, 389 S.E.2d at 676. Moreover, because multiple plaintiffs could not join together in a single action when the punitive damages cap was enacted in 1987, *see supra* Part II.B.1, there can be little doubt that the General Assembly intended the cap to apply only on a per-plaintiff basis. Indeed, it would have been all but impossible for Va. Code § 8.01-38.1 to have applied at all in multi-plaintiff proceedings until 1995 (eight years after enactment), when the Legislature first authorized multi-plaintiff joinder in Virginia courts.

*Fourth*, Virginia's rules of statutory construction "discourage any interpretation of a statute that would render any part . . . absurd." *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014). This principle cements the superiority of a per-plaintiff interpretation of the punitive damages cap. If the punitive damages cap did not apply on a per-plaintiff basis, then multiple plaintiffs asserting rights to relief and seeking punitive damages for the same occurrence would have a strong incentive *not* to join their actions. Joinder would limit each plaintiff's potential recovery of punitive damages to a fraction of $350,000, while proceeding individually would preserve each plaintiff's ability to recover a full $350,000 punitive damages award. A rational plaintiff would have little incentive to join with others in a single proceeding—no matter how efficient or convenient doing so would be. The district court's construction of the statute therefore creates a

perverse incentive for plaintiffs who might otherwise wish to pursue joinder and risks straining the courts with duplicative litigation involving the same core facts. *See Bagley v. Shortt*, 410 S.E.2d 738, 739 (Ga. 1991) (interpreting analogous punitive damages cap to apply on a per-plaintiff basis for this reason); *Rhyne v. K-Mart Corp.*, 562 S.E.2d 82, 93 (N.C. Ct. App. 2002) (same), *aff'd*, 594 S.E.2d 1 (N.C. 2004).

Burdening courts and parties alike in this manner contravenes Virginia public policy. The Commonwealth's courts (like their federal counterparts) prefer "the efficient use of court resources" through "joinder." *Wright v. Eli Lilly & Co.*, 66 Va. Cir. 195, 224 (2004); *cf. United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966) (noting that under the Federal Rules of Civil Procedure, "joinder of claims, parties and remedies is strongly encouraged"); *Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 218 n.5 (4th Cir. 2007) (explaining that the federal joinder rules "promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits" (internal quotation marks omitted)). And Virginia's political branches have repeatedly enacted "statutes . . . in order to promote judicial economy," including those "concerning joinder of claims," *Sykes v. Brady-Bushey Ford, Inc.*, 69 Va. Cir. 219, 224 (2005); the MCLA's plaintiff-joinder provision, at least as to cases (like this one) involving "*six or more* plaintiffs," *see Cawlo*, 106 Va. Cir. at 244; and the MCLA's provision authorizing consolidation, *see* Va. Code

38

§ 8.01-267.1 (directing courts to "promote . . . the just and efficient conduct and disposition" of disputes, and to consider "the efficient utilization of judicial facilities and personnel," when determining when to consolidate civil litigation).

This very case presents a compelling example of how the district court's interpretation of Va. Code § 8.01-38.1 would undermine these policies and lead to bizarre results. In this case—which may have been the Western District of Virginia's longest-ever jury proceeding, J.A. 4348:1-3—Plaintiffs would have had every incentive to litigate separately and to strenuously resist any attempt at consolidation. Defendants would have attempted to consolidate Plaintiffs' actions, because even though consolidation is supposed to be only a *procedural* device, such a ruling (under the district court's interpretation of the cap) would have dramatically abridged Plaintiffs' *substantive* rights to recover by a collective $2.45 million. And if, instead, the trial court had protected these substantive rights (again, under the district court's interpretation of the cap) by denying consolidation, up to eight juries could each have been asked to independently consider several hundred exhibits and dozens of witnesses in separate, multi-week trials. Moreover, the moment any jury had rendered a verdict, the other seven proceedings would have been derailed with thorny legal disputes over estoppel.

This is no way to run a railroad. And this patently absurd outcome—which the General Assembly sought to avoid by enacting the MCLA three decades ago—strongly supports a per-plaintiff interpretation.

### 3. Constitutional avoidance concerns support a per-plaintiff interpretation.

In addition to being consistent with original meaning and canons of statutory interpretation, a per-plaintiff construction of the punitive damages cap is necessary to avoid significant constitutional concerns. *See Commonwealth v. Doe*, 682 S.E.2d 906, 908 (Va. 2009) ("[W]henever possible, [the Virginia Supreme Court] will interpret statutory language in a manner that avoids a constitutional question."); *Virginia Soc. for Hum. Life v. Caldwell*, 500 S.E.2d 814, 816-17 (Va. 1998) ("[W]e will narrowly construe a statute where such a construction is reasonable and avoids a constitutional infirmity."); *accord In re Butcher*, 125 F.3d 238, 241 (4th Cir. 1997) (applying this principle when interpreting state law and "presum[ing] that the [state] legislature acted legally and in compliance with the [State] Constitution"). Specifically, interpreting the punitive damages cap to apply to all plaintiffs who have joined in a single action raises serious equal protection problems. There is simply no conceivable rational basis for arbitrarily treating plaintiffs who sue jointly far worse, in a substantive sense, than those who sue successively (and inefficiently).

The Florida Supreme Court invalidated a damages cap on precisely this basis in *Estate of McCall v. United States*, 134 So. 3d 894, 901 (Fla. 2014). In that case, a

40

district court found the United States liable for the death of a patient and concluded that the petitioners' noneconomic damages amounted to $2 million, but it limited their recovery to $1 million under Florida's cap on such damages in medical malpractice cases. The Florida Supreme Court, on certification from the Eleventh Circuit, found that the state-law cap improperly "impose[d] unfair and illogical burdens on injured parties when an act of medical negligence g[ave] rise to multiple claimants." *Id*. Because the cap "irrationally" treated multiple-claimant cases "far less favorably," the court held that it violated the state constitution's guarantee of equal protection. *Id*. at 901-02; *see also Beason v. I. E. Miller Servs., Inc.*, 441 P.3d 1107, 1111-12 (Okla. 2019) (striking down personal-injury damages cap because it arbitrarily distinguished between claimants who survived injuries and those who did not, in violation of state constitutional prohibition against special legislation).

To avoid these serious constitutional questions, the Court should reject the district court's problematic interpretation in favor of a per-plaintiff reading of the cap, which, for the reasons explained above, is eminently "reasonable," *Caldwell*, 500 S.E.2d at 817, and "possible," *Doe*, 682 S.E.2d at 908; *see also id.* at 909 (rejecting interpretation of statute that, as here, would "raise[] a constitutional question" and "permit absurd results"). Applying the canon of constitutional avoidance is particularly appropriate here because it would "giv[e] effect to

41

[legislative] intent, not . . . subvert[] it." *Clark v. Martinez*, 543 U.S. 371, 382 (2005).[12]

### 4. *Persuasive authority from other jurisdictions supports a per-plaintiff interpretation.*

Of course, Virginia is far from the only jurisdiction with a statute limiting the availability of punitive damages. Authority from several other states that have adopted similar measures provides compelling support for a per-plaintiff reading of the Virginia statute here. For example, the Georgia Supreme Court has adopted a per-plaintiff construction of Georgia's statutory cap on punitive damages, Ga. Code § 51-12-5.1, which mirrors Virginia's statute in its reference to "any" action: "For any tort action [with certain exceptions] in which the trier of fact has determined that punitive damages are to be awarded, the amount which may be awarded in the case shall be limited to a maximum of $250,000.00." *See Bagley*, 410 S.E.2d at 739 n.2. In *Bagley*, the Georgia Supreme Court held that this language "means that $250,000 is the maximum amount of money that the finder of fact may award to any one

---

[12] The district court asserted that Plaintiffs "d[id] not develop any argument" for why the court's reading of the statute would present constitutional concerns, J.A. 4822, and quoted *Wackenhut*'s rejection of "substantive due process challenges to statutory damages caps," *id.* (quoting *Wackenhut*, 979 F.2d at 985). But Plaintiffs explained that "separa[ting] plaintiffs into higher and lower damages classes based solely on whether they brought their suits individually or jointly" implicated not only due process, but also equal protection. ECF 1572 at 19. As explained above, the equal protection concern is plainly a valid one, *see, e.g.*, *McCall*, 134 So. 3d at 901, and this Court's decision in *Wackenhut* did not address it, *see* 979 F.2d at 985. Accordingly, the district court was wrong to dismiss it.

plaintiff as punitive damages—regardless of the number of defendants and regardless of the number of theories of recovery 'arising out of the same transaction, occurrence, or series of transactions or occurrences.'" *Id.* at 739 (emphasis omitted).

Notably, the *Bagley* court's rationale exposes the flaws in the district court's contrary interpretation here. Specifically, the court in *Bagley* explained that "the problem with" applying the Georgia cap to the overall action "without regard to the number of plaintiffs" is that "this interpretation" is "likely" to "produce a proliferation of case filings. It would encourage the splitting of causes of action with sophistry and quibble that would rival medieval Schoolmen. Surely, it was not the intent of the General Assembly to stimulate the maximum number of civil actions relating to a single occurrence." *Id.*

Similarly, the Supreme Court of North Carolina has adopted a per-plaintiff construction of North Carolina's statutory cap on punitive damages, which again resembles Va. Code § 8.01-38.1 by applying to "all actions." *See Rhyne*, 594 S.E.2d at 7. North Carolina's cap provides that "[i]n all actions seeking an award of punitive damages, the trier of fact shall determine the amount of punitive damages separately from the amount of compensation for all other damages"; "[p]unitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater." N.C. Gen. Stat. § 1D-25. In holding that this cap applied on a per-plaintiff

43

basis, the North Carolina Supreme Court affirmed the ruling of the intermediate appellate court, which persuasively identified the absurd implications of a contrary reading: "Our courts have encouraged parties to join in lawsuits to better consolidate and facilitate cases. [The defendant's] proposal would discourage parties from joining. Plaintiffs would not take the chance that their possible recoveries would be diluted, not by any defect in their claims, but solely because there was more than one plaintiff." *Rhyne*, 562 S.E.2d at 93, *aff'd*, 594 S.E.2d 1.

The courts of other states, too, have applied similar state damages caps on a per-plaintiff basis.[13] Particularly given the absence of on-point Virginia case law, these authorities offer yet more persuasive authority favoring a per-plaintiff interpretation of Va. Code § 8.01-38.1.

> 5. *The district court erred in deeming irrelevant virtually all these authorities.*

In dismissing this overwhelming support for a per-plaintiff interpretation of the punitive damages cap, the district court committed two fundamental errors.

---

[13] *See, e.g.*, *Davis v. White*, No. 7:17-cv-01533, 2022 WL 3083458, at *3 (N.D. Ala. Aug. 3, 2022) (applying Ala. Code § 6-11-21(a), which caps punitive damages "in all civil actions," on a per-plaintiff basis); *Carson v. City of Prichard*, 709 So. 2d 1199, 1205 (Ala. 1998) (holding that a distinct $100,000 statutory limit on damages against governmental entities "does not limit all plaintiffs" to "an aggregate recovery of $100,000" (emphasis omitted)); *Irwin v. Town of Ware*, 467 N.E.2d 1292, 1306 (Mass. 1984) (concluding that a "$100,000 limitation on liability . . . applied on a per-plaintiff basis").

*First*, at the outset, the district court read far too much into this Court's ruling in *Al-Abood*. In that case, this Court held that the punitive damages cap applied across multiple *defendants* based in significant part on unambiguous statutory language ("against all defendants") that has no application here. Despite this distinction, the district court repeatedly cited *Al-Abood* as having effectively prejudged the per-*plaintiff* question presented in this case. *See* J.A. 4819-20, 4823-24, 4825. That gave short shrift to this Court's admonishment that it "express[ed] *no opinion* on how the cap would be applied in a case involving multiple plaintiffs." *Al-Abood*, 217 F.3d at 237 n.10 (emphasis added).

To be sure, after interpreting the phrase "against all defendants" in accord with its plain meaning, the *Al-Abood* Court remarked that "even without the 'against all defendants' phrase, the statute refers to the 'total amount awarded' '[i]n any action.'" *Id.* at 237 (alteration in original); *see also* J.A. 4820. But that one sentence in *Al-Abood* was necessarily confined to the issue before the Court in that case: whether "action" was susceptible to a per-defendant reading, not a per-plaintiff one. That distinction makes all the difference. As explained above, by the time of the cap's enactment in 1987, Virginia law had long differentiated between joinder of defendants (which it permitted) and joinder of plaintiffs (which it all but prohibited). Thus, while a plaintiff could sue multiple defendants so long as the claims arose out of the same transaction or occurrence, multiple plaintiffs with distinct injuries could

45

not litigate together against the same defendant or defendants, even if their claims arose out of the same transaction or occurrence. The district court overlooked this vital state-law context when it reflexively extended *Al-Abood* to the per-plaintiff question.

*Second*, and relatedly, the district court did not even attempt to define "action" in the context of *this* statute. Instead, the district court simply presumed that the word "action" means the entirety of multi-plaintiff proceedings. It then compounded that threshold error by committing another: completely disregarding original meaning, interpretive canons, persuasive authority from other jurisdictions, grave constitutional concerns, and common sense. *See* J.A. 4822 (dismissing constitutional avoidance concerns); J.A. 4822-23 (setting aside absurdity and public policy); J.A. 4823 (rejecting persuasive authority interpreting analogous caps).

Because original meaning, interpretive canons, grave constitutional concerns, and persuasive authority each support a per-plaintiff interpretation of Va. Code § 8.01-38.1, this Court should, at minimum, reverse the district court's contrary ruling and remand with instructions to apply the cap on a per-plaintiff basis.

46

## III. APPELLANTS PROVIDE NO BASIS TO DISTURB THE DISTRICT COURT'S FINDING OF JOINT AND SEVERAL LIABILITY

Appellants challenge the judgment solely on the ground that the district court erred in finding them jointly and severally liable with their co-conspirators for the compensatory damages the jury awarded on Counts IV and V. *See* Opening Br. at 4.[14] That argument is doubly mistaken. As a threshold matter, Appellants forfeited their challenges because they failed to raise those challenges in the district court. But even if this Court were to reach the merits, the district court did not err (let alone fundamentally err) in holding Appellants, whom the jury found liable for an unlawful conspiracy in Count III, jointly and severally liable on Counts IV and V. In Virginia, it is well established that where, as here, defendants commit a conspiracy, they are all jointly and severally liable for the predicate acts committed by their co-conspirators. The Court should therefore reject Appellants' belated attack on the verdict.

### A. Appellants Forfeited Their Challenge to Joint and Several Liability.

As a preliminary matter, Appellants forfeited their contention that they should not be held jointly and severally liable for damages awarded under Counts IV and V

---

[14] Appellants focus on Counts IV and V because, along with Count VI, the jury awarded "virtually all compensatory damages" on those counts. Opening Br. at 3. But Count VI is not relevant for purposes of their appeal because the judgment does not treat Appellants as jointly and severally liable for compensatory damages on that count. *See* J.A. 4867.

because they did not raise these challenges in the district court. That failure is fatal to their appeal. As this Court has repeatedly explained, "[i]ssues raised for the first time on appeal are generally not considered absent exceptional circumstances." *Williams v. Pro. Transp. Inc.*, 294 F.3d 607, 614 (4th Cir. 2002). Appellants do not argue that exceptional circumstances excuse their failure to raise their challenges in the district court. *See Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 242 (4th Cir. 2009) ("[Appellant] has not even argued that exceptional circumstances justifying departure from the general rule are present.").

Nor could they. No such exceptional circumstances exist where Appellants had the opportunity to raise the same arguments over a year ago in the district court. *See Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020) (explaining that "'the parties' litigation conduct' determines what issues are properly before a court, and a defense may be 'forfeited if the party asserting [it] waits too long to raise the point'" (alteration in original) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004))). Here, Appellants could and should have raised the arguments they now raise on appeal when Plaintiffs filed a post-trial motion in March 2022, which affirmatively requested a ruling from the district court that Defendants were jointly and severally liable on Counts III, IV, and V. *See* ECF 1554 at 18-19. Not a single Defendant, let alone any Appellant, opposed Plaintiffs' motion. Plaintiffs again argued that Defendants were jointly and severally liable on Counts III, IV, and V in their

48

opposition to Defendants' post-trial motions. *See* ECF 1572 at 18-19. And again, none of the Appellants rebutted the point.

Given these failures, Appellants have forfeited their belated challenges to joint and several liability. *See De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 528-29 (4th Cir. 2022) (holding that defendants-appellants forfeited issue of joint and several liability by failing to "contest [the issue] below," even though they "knew [plaintiffs] sought [it]"); *see also Hadeed v. Abraham*, 103 F. App'x 706, 708 (4th Cir. 2004) (concluding that parties who "did not oppose the motion" at issue "in the district court . . . have forfeited this issue on appeal"); *accord Joseph v. Allen*, 712 F.3d 1222, 1226 (8th Cir. 2013) (concluding that a party who "did not oppose the motion" at issue in "the district court" and who raised challenges "for the first time on appeal" had "waived" the argument); *Resnick v. Patton*, 258 F. App'x 789, 793 n.1 (6th Cir. 2007) (concluding that failure to oppose a motion to dismiss in the district court "waived" challenges on appeal). The Court should therefore affirm the district court's ruling that Appellants are jointly and severally liable.

**B.     In Any Event, Virginia Law Clearly Establishes That Appellants Are Jointly and Severally Liable.**

Even if this Court were to look past Appellants' clear forfeiture, Appellants offer no basis to reverse the district court's finding that they are jointly and severally liable for the damages awarded under Counts IV and V. As this Court has explained, when "a party in a civil case fails to raise an argument in the lower court and instead

49

raises it for the first time before us, [the Court] may reverse *only if* the newly raised argument establishes 'fundamental error' or a denial of fundamental justice." *Ferreyra*, 965 F.3d at 310 (emphasis added) (quoting *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014)). Again, Appellants have not "contended at all with [this Court's] 'fundamental error' standard or attempted to show that they can meet it here," which "alone" suffices to disqualify their challenges. *Id.* at 311. As explained below, Appellants have not identified any error (much less a *fundamental* error) in the district court's well-reasoned conclusion that they are jointly and severally liable for the compensatory damages awarded on Counts IV and V.

### 1. Appellants are liable for all damages committed as part of their conspiracy.

The district court's judgment correctly reflects the jury instructions, the jury's findings, and black-letter Virginia law. Because the jury found Appellants liable as co-conspirators for the unlawful conspiracy in Count III, Appellants are jointly and severally liable not only for the compensatory damages the jury awarded for that unlawful conspiracy, but also for the damages the jury awarded for the acts of their co-conspirators on Counts IV and V, the predicate acts of the conspiracy.

It is undisputed that Appellants are jointly and severally liable on the Virginia state law conspiracy claim in Count III. As Appellants openly admit, they and "[a]ll Defendants were found liable under the Count III state law conspiracy claim." Opening Br. at 6; *see also* J.A. 4749. That concession controls the result: Co-

conspirators in Virginia are jointly and severally liable for all damages committed as part of a conspiracy. *See, e.g.*, *Tire Eng'g & Dist., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 312 n.10 (4th Cir. 2012) (co-conspirators are "jointly and severally liable for all acts of coconspirators taken in furtherance of the conspiracy"); *La Bella Dona Skin Care, Inc. v. Belle Femme Enters., LLC*, 805 S.E.2d 399, 406 (Va. 2017) ("[C]ivil conspiracy is a mechanism for spreading liability amongst coconspirators for damages sustained as a result of an underlying act that is itself wrongful or tortious." (alteration in original) (quoting *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014))); *Gelber v. Glock*, 800 S.E.2d 800, 821 (Va. 2017) ("The object of a civil conspiracy claim is to spread liability to persons other than the primary tortfeasor. Consequently, 'a common law claim of civil conspiracy generally requires proof that the underlying tort was committed.'" (quoting *Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007)); *Worrie v. Boze*, 95 S.E.2d 192, 198 (Va. 1956) ("conspirators are jointly and severally liable for all damage resulting from the conspiracy"), *abrogated in part on other grounds by Station #2, LLC v. Lynch*, 695 S.E.2d 537, 541 (Va. 2010).

Here, the jury received clear instructions that the acts listed in Counts IV and V were the predicate acts of the unlawful conspiracy at issue in Count III. *See* J.A. 4832-33 n.31 ("These counts include Count III (Virginia state law civil conspiracy), as well as Count IV (violation of Virginia's hate-crime statute) and Count V (assault

51

and battery)—both of which the Court instructed the jury would constitute predicate unlawful acts of the conspiracy.").[15] And the jury not only found Appellants liable for the conspiracy in Count III; it also found that Appellants' co-conspirators committed the predicate acts of the conspiracy (as alleged in Counts IV and V). *See* J.A. 4749-54. Given the jury instructions and the verdict, the district court correctly observed that "[u]nder Virginia law, the jury's finding of liability on the civil conspiracy claim 'meant that [Defendants] were held jointly and severally liable for the damages award.'" J.A. 4831 (quoting *Tire Eng'g & Dist., LLC*, 682 F.3d at 312 n.10).[16]

Thus, even if this Court were to excuse Appellants' forfeiture, the district court correctly imposed joint and several liability on "[a]ll Defendants . . . for the nominal and compensatory damages awarded by the jury on Counts III, IV, and V,

---

[15] Specifically, Jury Instruction No. 23 explained that Counts IV and V were predicate acts of the conspiracy alleged in Count III. *See* J.A. 4706-08; J.A. 4832-33 n.31. Jury Instruction No. 24 explained that certain Plaintiffs also brought a "standalone claim" against certain Defendants "under Virginia Code § 8.01-42.1 for racial, religious or ethnic harassment, or violence" (*i.e.*, Count IV). J.A. 4709. Jury Instruction No. 25 explained that certain Plaintiffs also brought a "standalone claim" for assault and battery under Virginia law against Defendant Fields (*i.e.*, Count V). J.A. 4711-12. The jury verdict form, in turn, listed the Defendants against whom a given set of Plaintiffs had asserted each of Counts III, IV, and V. J.A. 4746-55.

[16] Appellants' assertion that the district court did not explain why Count VI "was excluded from its joint and several liability Order," Opening Br. at 4, is of no moment because Count VI (intentional infliction of emotional distress by Defendant Fields) was not a predicate act for the unlawful conspiracy in Count III, *see* J.A. 4706-07.

which amount is $1,303,284." J.A. 4867.

     *2. Appellants' counterarguments, if not forfeited, are meritless.*

Resisting this settled understanding of Virginia law, Appellants advance four related arguments on appeal. But these arguments—all of which were forfeited—lack merit.

*First*, Appellants latch onto a single sentence in a decision by a Virginia circuit court, *Wright v. Eli Lilly & Co.*, 66 Va. Cir. 195 (2004), which states, "where the damages caused by the wrongful acts of two or more persons produce a single injury, both tort-feasors may be held liable for the entire amount of the injured person's damages." *Id.* at 212. From this, Appellants extrapolate the argument that, under the logic of *Wright*, any finding of joint and several liability requires that the defendants jointly produce a single injury. And because Counts III, IV, and V did not involve a single injury, Appellants argue, they cannot be jointly and severally liable for the compensatory damages awarded on Counts IV and V. *See* Opening Br. at 6-8.

This argument misconstrues *Wright*, which addressed only one situation in which the imposition of joint and several liability is appropriate: where joint tortfeasors produce an indivisible injury. *See* 66 Va. Cir. at 211-16. *Wright* did not purport to offer an exhaustive list of the circumstances that may result in joint and several liability, nor did the court confront, much less discuss, another quintessential situation that gives rise to joint and several liability: when joint tortfeasors engage

in a common-law conspiracy. *See Gelber*, 800 S.E.2d at 821 ("The object of a civil conspiracy claim is to spread liability to persons *other than the primary tortfeasor*." (emphasis added)); *Brin v. A Home Come True, Inc*., 79 Va. Cir. 33, 38 (2009) (concluding that defendant was jointly and severally liable for damages caused by fraud where the defendant was a member of the conspiracy to commit fraud).[17] Tellingly, Appellants fail to identify a single authority to the contrary.

*Second*, Appellants assert—again relying on their "no single injury" theory under *Wright*—that they could not be found jointly and severally liable on Counts IV and V because Appellants were not named as defendants under Counts IV or V and because the verdict form "specifically prohibited [the jury] from finding Appellants liable on Counts IV or V." Opening Br. at 5.

This argument misconstrues the jury instructions, which both described the Virginia state law civil conspiracy charge under Count III and explained that the wrongful acts asserted under Counts IV and V were the predicate acts of that conspiracy. *See supra* note 15. The jury found that one set of co-conspirator

---

[17] *See also, e.g.*, 15A C.J.S. Conspiracy § 21 (2023) ("The fact of a conspiracy, if proved, makes the act of any one conspirator chargeable to all and thus allows for the imposition of joint and several liability for acts of coconspirators committed in furtherance of the common design or conspiracy." (footnotes omitted)); 1 Alfred W. Gans, Charles F. Krause & Stuart M. Speiser, American Law of Torts § 3:4 (2023) ("Once a conspiracy is proven, each coconspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'").

Defendants committed the predicate acts of the conspiracy asserted in Count IV and another set of co-conspirator Defendants committed the predicate acts asserted in Count V. Indeed, had the jury found that certain Defendants committed the wrongful acts asserted in Counts IV and V but declined to find a conspiracy in Count III, Appellants would not have been held liable for the damages caused by the violations of law in those two counts. But the jury *did* find a conspiracy in Count III. The jury found that all Defendants, including Appellants, participated in that conspiracy and that Appellants' co-conspirators committed the predicate acts of that conspiracy as alleged in Counts IV and V. Accordingly, the district court's judgment confirming Appellants' joint and several liability on all three of those counts—the conspiracy itself (Count III) and the predicate acts of that conspiracy (Counts IV and V)—was correct as a matter of law. *See La Bella Dona Skin Care*, 805 S.E.2d at 406; *Worrie*, 95 S.E.2d at 198; 15A C.J.S. Conspiracy § 21.

*Third*, Appellants argue that they should not be held jointly and severally liable because the jury awarded "hundreds of thousands of compensatory damages" on Counts IV and V, but only nominal damages on Count III. Opening Br. at 7. This contrast, they speculate, shows that "the jury must have considered the injuries suffered under Count IV and V as distinct from those suffered under Count III." *Id.* at 6. To the extent Appellants now attempt to suggest that the jury verdict is somehow inconsistent, they waived any such argument by failing to object before

the jury was dismissed. *See White v. Celotex Corp.*, 878 F.2d 144, 146 (4th Cir. 1989). And in any event, their conjecture is unpersuasive and should be rejected on the merits. This Court has a duty "to determine whether a jury verdict can be sustained, on any reasonable theory" and to "harmonize seemingly inconsistent verdicts if there is any reasonable way to do so." *Atlas Food Sys. & Servs. Inc. v. Crane Nat'l Vendors, Inc*., 99 F.3d 587, 599 (4th Cir. 1996) (internal quotation marks omitted).

There is no basis to find an inconsistency in the jury's verdict. Indeed, the damages awarded on Counts III, IV, and V are entirely consistent with the district court's instructions and the jury's finding that all Defendants, including Appellants, are liable as co-conspirators for the predicate acts of the conspiracy. The court properly instructed the jury to avoid double recovery for the same injury. *See* J.A. 4729 (Jury Instruction No. 34, instructing that "[w]here the same acts cause the *same injury or loss* to Plaintiffs under more than one claim, the Plaintiffs may recover only once for that injury or loss" (emphasis added)); *see also Dominion Res., Inc. v. Alstom Power, Inc.*, 825 S.E.2d 752, 755 (Va. 2019) ("A fundamental principle of damages is that a plaintiff may not receive double recovery for a single injury."). As the district court correctly explained, the damages awarded show that the jury reasonably followed that instruction and "sought to avoid awarding any double recovery" on Counts III, IV, and V. J.A. 4832. Indeed, the fact that the jury awarded

only nominal damages on some counts despite a finding of liability confirms that "the total damages award reflects the jury's assessment of the full measure of damages" flowing from the conspiracy, as the district court noted. *Id.* Nothing in this record supports Appellants' attempt to evade responsibility for the harm caused by their conspiracy. *See Dominion Res.*, 825 S.E.2d at 755; *cf. Anderson v. Anderson Tooling, Inc.*, 928 N.W.2d 821, 828 (Iowa 2019) (no abuse of discretion in holding co-conspirators jointly and severally liable for damages awarded against co-defendant where "a logical deduction" was that the two torts the co-defendant personally committed served as the basis for the conspiracy).

Consistent with the jury instructions and the requirement that a jury must "distinguish[] the amount attributable to each claim," *Tire Eng'g & Dist., LLC*, 682 F.3d at 313 (alteration in original) (quoting *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1278 (4th Cir. 1994)), the jury found liability on all three counts and divided the damages among them, assigning greater compensatory damages to Counts IV and V:

- On Count III—an unlawful conspiracy by all Defendants to violate Va. Code § 8.01-42.1 (the hate-crime statute) and to commit assault and battery—the jury awarded nominal compensatory damages of $1 to the Plaintiffs, except Sines and Wispelwey, who received $0. J.A. 4750.

- On Count IV—violations of Va. Code § 8.01-42.1 (the hate-crime statute) by Defendants Kessler, Spencer, Kline, Ray, and Cantwell—the jury awarded Plaintiffs Romero and Willis each $250,000 in compensatory damages, J.A. 4752, and $0 in

57

compensatory damages for violations of Va. Code § 8.01-42.1 by Defendant Fields, J.A. 4753.

- On Count V—assault and battery by Defendant Fields—the jury awarded a range of compensatory damages to Plaintiffs Romero, Muñiz, Baker, Blair, and Martin. J.A. 4753.

Thus, the fact that the jury awarded more damages to the predicate acts of the conspiracy than to the conspiracy count is entirely understandable, *see, e.g.*, *Anderson*, 928 N.W.2d at 827, and does not show reversible error.

*Finally*, Appellants argue the district court "violated the Seventh Amendment by awarding damages—a jury function—against Appellants, contrary to the jury's verdict." Opening Br. at 8. That assertion is flatly incorrect. Here, the jury dutifully performed its role in awarding damages to Plaintiffs on Counts III, IV, and V. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998); J.A. 4750-55. And the district court, in turn, appropriately performed its own function—declaring what the law requires as a result of that verdict. *See In re KBR, Inc. Burn Pit Litig.*, 893 F.3d 241, 259 (4th Cir. 2018) (federal courts have "emphatic duty to say what the law is" (internal quotation marks omitted)); *see also Liberty Mut. Ins. Co. v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir. 1992) (stating that "a federal court sitting in diversity has a duty to apply the operative state law as would the highest court of the state in which the suit was brought"). The district court did not violate the Constitution by concluding that, as a matter of Virginia law, Appellants were jointly and severally liable for the compensatory damages awarded by the jury.

For these reasons, the Court should affirm the district court's finding that Appellants are jointly and severally liable for the compensatory damages awarded under Counts IV and V.

## CONCLUSION

For the foregoing reasons, the district court's application of the punitive damages cap to reduce the jury's verdict, as well as its refusal to assess additional punitive damages against the defaulted Defendants, should be reversed. The Court should affirm that Appellants are jointly and severally liable on the compensatory damages awarded by the jury on Counts IV and V.

June 23, 2023

Respectfully submitted,

*/s/* Raymond P. Tolentino

David E. Mills
Joshua M. Siegel
Caitlin B. Munley
Robby Lee Ray Saldaña
Khary J. Anderson
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 842-7800
dmills@cooley.com

Alan D. Levine
COOLEY LLP
55 Hudson Yards
New York, New York 10001
(212) 479-6000
alevine@cooley.com

Raymond P. Tolentino
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
rtolentino@kaplanhecker.com

Roberta A. Kaplan
Gabrielle E. Tenzer
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
gtenzer@kaplanhecker.com

Karen L. Dunn
Jessica E. Phillips
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300
kdunn@paulweiss.com

Yotam Barkai
Melina Maria Meneguin Layerenza
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10118
(212) 373-3000
ybarkai@paulweiss.com

*Attorneys for Plaintiffs-Appellees/Cross-Appellants*

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34 and this Court's Local Rules and Internal Operating Procedures, Plaintiffs respectfully request oral argument as to their cross-appeal on the punitive damages cap. The dispositive issue has not been authoritatively decided, and the decisional process will be significantly aided by oral argument. Plaintiffs submit that oral argument is unnecessary as to the Appellants' sole issue on appeal, which is forfeited and meritless under controlling precedent.

## CERTIFICATE OF COMPLIANCE

I, Raymond P. Tolentino, counsel for Plaintiffs-Appellees/Cross-Appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1), that the attached Opening/Response Brief of Plaintiffs-Appellees/Cross-Appellants is proportionately spaced, has a typeface of 14 points or more, was prepared using Word for Microsoft 365, and contains 14,371 words.

/s/ Raymond P. Tolentino
Raymond P. Tolentino

Dated: June 23, 2023

# CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, I served the following via ECF:

David L. Campbell
Justin Saunders Gravatt
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
dcampbell@dhdglaw.com
jgravatt@dhdglaw.com

*Counsel for Cross-Appellee James A.
Fields, Jr.*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Cross-Appellees Michael
Hill, Michael Tubbs, and League of the
South*

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net

James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
JIM@TradLawyer.com

*Counsel for Cross-Appellees Nathan
Damigo and Identity Europa, Inc.
(Identity Evropa)*

William Edward ReBrook, IV
The ReBrook Law Office
6013 Clerkenwell Court
Burke, VA 22015

1420 Cardinal Road
Charleston, WV 25314
edward@rebrooklaw.com
rebrooklaw@gmail.com

*Counsel for Cross-Appellees Matthew
Heimbach, Matthew Parrott,
Traditionalist Worker Party, National
Socialist Movement, and Nationalist
Front*

Joshua Smith
Smith LLC
807 Crane Avenue
Pittsburgh, PA 15216-2079
joshsmith2020@gmail.com

*Counsel for Cross-Appellees Matthew
Heimbach, Matthew Parrott, and
Traditionalist Worker Party*

I further hereby certify that on June 23, 2023, I also served the following via electronic mail:

Christopher Cantwell
christopher.cantwell@gmail.com

I further hereby certify that on June 23, 2023, I caused to be served the following by physical mail:[18]

Jason Kessler
6256 Bullet Dr.
Crestview, FL 32536

1100 Wythe Street, Unit 1812
Alexandria, VA 22313

Vanguard America
c/o Dillon Hopper
383 Hazzard Street
Scottsburg, IN 47170

Robert "Azzmador" Ray
22345 Cherry Lane
Frankston, TX 75763

Jeff Schoep
PO Box 66335
Roseville, MI 48066

Moonbase Holdings, LLC
c/o Andrew Anglin
6827 N. High Street, Ste. 121
Worthington, OH 43085

P.O. Box 208
Worthington, OH 43085

Richard Spencer
734 Clearwater Drive
Whitefish, MT 59937

Elliott Kline a/k/a Eli Mosley
117 Mesa Drive
Reading, PA 19608

Augustus Sol Invictus
424 E. Central Blvd #156
Orlando, FL 32801

---

[18] In addition to the herein-described service via U.S. Mail and electronic mail, Plaintiffs-Appellees/Cross-Appellants served the brief to the following Defendants who have not consented to service via electronic mail: Elliott Kline (eli.f.mosley@gmail.com; deplorabletruth@gmail.com; eli.r.kline@gmail.com); Jeff Schoep (commander@newsaxon.com); Richard Spencer (richardbspencer@icloud.com; richardbspencer@gmail.com); Robert Ray (azzmador@gmail.com); and Vanguard America c/o Dillon Hopper (dillon_hopper@protonmail.com).

East Coast Knights of the Ku Klux Klan
a/k/a East Coast Knights of the True
Invisible Empire
26 South Pine St.
Red Lion, PA 17356

Loyal White Knights of the Ku Klux
Klan
c/o Chris and Amanda Barker
2364 US Highway 158 E
Yanceyville, NC 27379

Fraternal Order of the Alt-Knights
c/o Kyle Sean Chapman
52 Lycett Circle
Daly City, CA 94015

/s/ Raymond P. Tolentino
Raymond P. Tolentino

Dated: June 23, 2023