**23-1119(L), 23-1122, 23-1154**

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

———— ◆ ◆ ————

ELIZABETH SINES; SETH WISPELWEY; MARISSA BLAIR;
APRIL MUNIZ; MARCUS MARTIN; JOHN DOE; NATALIE ROMERO;
CHELSEA ALVARADO; THOMAS BAKER,

*Plaintiffs-Appellees,*

—and—

TYLER MAGILL; HANNAH PEARCE,

*Plaintiffs,*

(*Caption continued on inside cover*)

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

———————————————————————————

**BRIEF FOR *AMICI CURIAE* THE HUMAN RIGHTS CAMPAIGN
FOUNDATION, THE SOUTHERN POVERTY LAW CENTER
AND LEGAL AID JUSTICE CENTER IN SUPPORT
OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS**

———————————————————————————

SARAH WARBELOW
CYNTHIA CHENG-WUN WEAVER
JP SCHNAPPER-CASTERAS
HUMAN RIGHTS CAMPAIGN
FOUNDATION
1640 Rhode Island Avenue NW
Washington, DC 20036
(202) 628-4160

ELIZABETH LITTRELL
SOUTHERN POVERTY LAW CENTER
150 Ponce de Leon Avenue, Suite 340
Decatur, Georgia 30030
(404) 377-0708

SCOTT D. MCCOY
SOUTHERN POVERTY LAW CENTER
2 Biscayne Boulevard, Suite 3750
Miami, Florida 33131
(334) 224-4309

EDWARD J. JACOBS
MICHELLE N. TANNEY
JONATHAN A. FORMAN
ROBYN M. FELDSTEIN
J'NAIA L. BOYD
SHADE I. QUAILEY
SYDNEY W. PARK
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200

KENDALL C. KASH
BAKER & HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
(216) 621-0200

*Counsel for Amici Curiae*

—v.—

MICHAEL HILL; MICHAEL TUBBS; LEAGUE OF THE SOUTH,

*Defendants-Appellants,*

—and—

JASON KESSLER; RICHARD SPENCER; CHRISTOPHER CANTWELL; JAMES ALEX FIELDS, JR.; VANGUARD AMERICA; ANDREW ANGLIN; MOONBASE HOLDINGS, LLC.; ROBERT AZZMADOR RAY; NATHAN DAMIGO; ELLIOTT KLINE, A/K/A Eli Mosely; IDENTITY EVROPA; MATTHEW HEIMBACH; DAVID MATTHEW PARROTT, A/K/A Matthew Parrott; TRADITIONALIST WORKER PARTY; JEFF SCHOEP; NATIONAL SOCIALIST MOVEMENT; NATIONALIST FRONT; AUGUSTUS SOL INVICTUS; FRATERNAL ORDER OF THE ALT-KNIGHTS; MICHAEL ENOCH PEINOVICH; LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN; EAST COAST KNIGHTS OF THE KU KLUX KLAN, A/K/A East Coast Knights of the True Invisible Empire,

*Defendants.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  23-1154          Caption:  Elizabeth Sines v. Jason Kessler

Pursuant to FRAP 26.1 and Local Rule 26.1,

Human Rights Campaign Foundation
(name of party/amicus)


who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                          ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Edward J. Jacobs                    Date:      June 30, 2023

Counsel for: Human Rights Campaign Foundation

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1154__     Caption: __Elizabeth Sines v. Jason Kessler__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Southern Poverty Law Center__
(name of party/amicus)

_____

 who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?                ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                    ☐YES ☑NO
     If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Edward J. Jacobs                          Date:      June 30, 2023

Counsel for: Southern Poverty Law Center

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1154__        Caption: __Elizabeth Sines v. Jason Kessler__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Legal Aid Justice Center__
(name of party/amicus)

_____

 who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?                ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                          ☐YES ☑NO
   If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Edward J. Jacobs                    Date:      June 30, 2023

Counsel for: Legal Aid Justice Center

Print to PDF for Filing

## TABLE OF CONTENTS

STATEMENT REGARDING AUTHORSHIP AND MONETARY CONTRIBUTIONS ........................................................................... 1

STATEMENT OF IDENTITIES AND INTERESTS OF *AMICI* ........................... 2

INTRODUCTION ........................................................................... 4

ARGUMENT ................................................................................ 5

    I.    THE STATUTORY CAP MUST BE INTERPRETED IN THE CONTEXT OF THE HISTORY OF VIOLENCE AGAINST DISFAVORED MINORITIES, ESPECIALLY BLACK PEOPLE ............................................................................. 5

    II.   *AMICI* HAVE LONG RELIED UPON PUNITIVE DAMAGES TO REMEDY AND DETER HATE CRIMES AND VIOLENCE ......................................................................... 9

    III.  THE VIRGINIA GENERAL ASSEMBLY COULD NOT HAVE INTENDED FOR THE STATUTORY CAP TO BE APPLIED TO CIVIL RIGHTS LITIGATION ................................... 12

        A.    Application of the Statutory Cap in Civil Rights Litigation Subverts Legislative Intent ....................................... 12

        B.    The District Court's Decision May Incentivize Hate Groups to Escalate and Coordinate Violence ........................... 13

        C.    The District Court's Decision Could Undermine Other Civil Rights Statutes and Cases ................................. 14

    IV.  APPLICATION OF THE STATUTORY CAP, LIMITED TO ITS INTENDED PURPOSE, WOULD PROMOTE EFFICIENT CIVIL RIGHTS LITIGATION ........................................... 15

CONCLUSION ............................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berhanu v. Metzger,*
  No. A8911-07007 (Or. Cir. Ct. 1990) ..............................................11

*Donald v. United Klans of America,*
  No. 84-0725-AH (S.D. Ala. 1984) ..................................................10

*Macedonia Baptist Church v. Christian Knights of the Ku Klux Klan –
Invisible Empire, Inc.*,
  No. 96-CP-14-217 (C.P. County of Clarendon Jul. 24, 1998) ..........................11

**Statutes**

73 Am. Jur. 2d Statutes § 155 ..............................................................12

Virginia Code § 8.01-38.1 ..................................................................4

**Other Authorities**

*Berhanu v. Metzger*, S. POVERTY L. CTR.,
  https://www.splcenter.org/seeking-justice/case-docket/berhanu-v-
  metzger (last visited June 27, 2023) ..............................................11

Breeanna Hare, *Inside the Case That Bankrupted the Klan,* CNN
  (Apr. 11, 2021, 2:40 AM),
  https://www.cnn.com/2021/04/10/us/michael-donald-case-
  timeline/index.html ................................................................10

*Conditions of Antebellum Slavery 1830-1860,* PBS ONLINE,
  https://www.pbs.org/wgbh/aia/part4/4p2956.html (last visited June
  27, 2023) ......................................................................5, 6

Damon Henderson Taylor, *Civil Litigation Against Hate Groups
Hitting the Wallets of the Nation's Hate-Mongers*, 18 BUFF. PUB.
INT. L. J. 95 (1999) ..............................................................10

*Emancipation and Reconstruction*, LIBRARY OF CONGRESS, https://www.loc.gov/classroom-materials/immigration/african/emancipation-and-reconstruction/ (last visited June 27, 2023) ................................................................6

EQUAL JUST. INITIATIVE, LYNCHING IN AMERICA: CONFRONTING THE LEGACY OF RACIAL TERROR 39 (3rd ed. 2017), https://eji.org/wp-content/uploads/2005/11/lynching-in-america-3d-ed-110121.pdf......................6

*Fact Sheet: Biden-Harris Administration Releases First-Ever U.S. National Strategy to Counter Antisemitism*, THE WHITE HOUSE (May 25, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/25/fact-sheet-biden-harris-administration-releases-first-ever-u-s-national-strategy-to-counter-antisemitism/ ................................................................9

*FBI Releases 2021 Hate Crime Statistics*, U.S. DEP'T OF JUST., https://www.justice.gov/hatecrimes/hate-crime-statistics (last visited Apr. 24, 2023) ................................................................9, 16

H.R.J. Res. 655, 2019 Leg. Sess. (Va. 2019) ................................................................7

*Hate Map*, S. POVERTY L. CTR., https://www.splcenter.org/hate-map (last visited June 27, 2023) ................................................................16

*History of Lynching in America*, NAACP, https://naacp.org/find-resources/history-explained/history-lynching-america (last visited June 27, 2023) ................................................................6, 7

*Macedonia v. Christian Knights of the Ku Klux Klan*, S. POVERTY L. CTR., https://www.splcenter.org/seeking-justice/case-docket/macedonia-v-christian-knights-ku-klux-klan (last visited June 27, 2023) ................................................................11

*McKinney v. Southern White Knights,* S. POVERTY L. CTR., https://www.splcenter.org/seeking-justice/case-docket/mckinney-v-southern-white-knights (last visited June 27, 2023) ................................................................11

*Mob of 700 White People Lynches Two Black Teenagers in Colorado County, TX*, EQUAL JUST. INITIATIVE, https://calendar.eji.org/racial-injustice/nov/12 (last visited June 27, 2023) ................................................................7

Nick Morrow, *Virginia Values Act Signed Into Law-Extending Long-Delayed, Critical Protections to LGBTQ Virginians*, HUM. RTS. CAMPAIGN (Apr. 11, 2020), https://www.hrc.org/news/virginia-values-act-signed-into-law-extends-protections-to-lgbtq-virginians .......3, 14, 15

Report of the Joint Subcommittee: Studying The Liability Insurance Crisis And The Need For Tort Reform, S. DOC. NO. 11 (1987) .................12, 13

Sarah Warbelow & Cathryn Oakley, *The Virginia Values Act: a Landmark Civil Rights Legislation Leapfrogs Virginia into a Leader on Equality*, 24 RICH. PUB. INT. L. REV. 30 (2021)................................15

*"They Hanged Him," Richmond Dispatch* (*November 9, 1889*), ENCYCLOPEDIA VA., https://encyclopediavirginia.org/entries/they-hanged-him-richmond-dispatch-november-9-1889/ (last visited June 27, 2023)........................................................................................7

Weihua Li & Jamiles Lartey, *New FBI Data Shows More Hate Crimes. These Groups Saw The Sharpest Rise*, THE MARSHALL PROJECT (Mar. 25, 2023, 12:00 PM), https://www.themarshallproject.org/2023/03/25/asian-hate-crime-fbi-black-lgbtq........................................................................................9

*Young Black Man Lynched for Allegedly Frightening White Girl in Leesburg, Virginia*, EQUAL JUST. INITIATIVE, https://calendar.eji.org/racial-injustice/nov/8 (last visited June 27, 2023) ........................................................................................7

## STATEMENT REGARDING AUTHORSHIP AND
## <u>MONETARY CONTRIBUTIONS</u>

*Amici* state that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *Amici* or their counsel made a monetary contribution to its preparation or submission.

## STATEMENT OF IDENTITIES AND INTERESTS OF *AMICI*

*Amici* are national civil rights organizations committed to fighting discrimination and hatred against marginalized communities, including racial and ethnic minorities, religious minorities, women, and the LGBTQ+ community. *Amici* regularly seek to vindicate civil rights through the legal system and courts across the country. Moreover, *Amici* have long relied on obtaining monetary forms of damages through the judicial system to provide redress to victims of violence and discrimination by white supremacists, racists, and bigots, and to deter groups and individuals engaged in such discriminatory and hateful behavior from performing such acts. As organizations at the forefront of civil rights advocacy, *Amici* are concerned with the broader implications of applying a cap on punitive damages and the negative effects that it might have on deterring violence, discrimination, and intimidation against marginalized populations.

The **Human Rights Campaign Foundation** is the educational arm of the Human Rights Campaign ("HRC"), America's largest civil rights organization working to achieve equality for LGBTQ+ people. Through its programs, the HRC Foundation seeks to make transformational change in the everyday lives of LGBTQ+ people, shedding light on inequity and deepening the public's understanding of LGBTQ+ issues, including advancing transgender and racial justice and the importance of reproductive health care. In Virginia, HRC was

instrumental in the passage of the Virginia Values Act, which provides legal protections against various forms of discrimination against LGBTQ+ people in the state.

The **Southern Poverty Law Center ("SPLC")** has been a catalyst for racial justice in the South since 1971, working to dismantle white supremacy and advance civil and human rights of all people. Since the reemergence of the Ku Klux Klan ("KKK") in the early 1980s, SPLC has monitored and exposed the activities of hate groups, and currently tracks over 1,600 extremist groups nationwide. SPLC is the architect of the legal strategy using civil litigation to hold hate groups financially accountable and provide redress to victims of their violent and hateful acts.

The **Legal Aid Justice Center ("LAJC")** is a nationally recognized statewide nonprofit legal aid society in Virginia. LAJC partners with communities and clients to fight for racial, social, and economic justice by dismantling systems that create and perpetuate poverty. Understanding that the legal problems of its clients are inextricably linked to overarching systems of injustice and oppression, LAJC combines individual legal representation, impact litigation, communications, policy advocacy, and organizing to achieve community goals.

## **INTRODUCTION**

Since the Civil Rights Movement in the 1950s and 1960s, civil litigation has been a critical means of combating extremism and hate groups that seek to terrorize and strip the humanity from marginalized communities across the United States. Punitive damage awards have played a significant role in deterring violent extremists and hate groups from their vile, harmful, and criminal acts. Over the years, these awards have been integral to providing redress to victims and imposing considerable financial penalties on these groups, which are duly justified under the law and ultimately beneficial for plaintiffs and society alike.

The tragic events in Charlottesville are a continuation of the hateful and violent legacy of the KKK and other white supremacist, racist, and bigoted groups. The jury's punitive damages award is essential in combatting these hate groups and a severe reduction to those damages would undercut not only the jury's well-founded judgment but also the core purpose of the award, which is meant to condemn and punish wrongful behavior.

Moreover, when viewed within a historical context, the Virginia General Assembly ("VGA") could not have intended for the limitation on punitive damages under Section 8.01-38.1 of the Virginia Code (the "Statutory Cap") to apply to civil rights cases—and certainly not to apply in a manner that effectively rewards defendants *because* they worked together to terrorize and otherwise coordinate their

4

dangerous actions. Unlike limitations for non-violent and non-discriminatory tort actions, such as medical malpractice cases where there are potential social benefits in limiting damages, punitive damages caps in civil rights actions provide no societal benefit. In fact, applying a punitive damages cap in the context of race- or religious-based violence could, instead of deterring violence, allow discrimination and mass terrorism to foment and grow in Virginia. In other words, interpreting the statute to apply this limitation to multiple defendants could lead to the absurd result of *encouraging* extremists and hate groups to work together to commit their hateful and violent actions. Prudent statutory interpretation, American history, and the absurdity doctrine all point in favor of reversing the District Court.

## **ARGUMENT**

### I.    THE STATUTORY CAP MUST BE INTERPRETED IN THE CONTEXT OF THE HISTORY OF VIOLENCE AGAINST DISFAVORED MINORITIES, ESPECIALLY BLACK PEOPLE.

It is critical to understand and construe the Statutory Cap—and the horrific events in Charlottesville in 2017—in the proper historical context.

Throughout the history of the United States, including in Virginia, Black people and other disfavored minorities have been subjected to brutal and dehumanizing treatment at the hands of white supremacists, racists, and bigots.[1]

---

[1] Dating back to colonial Virginia and the nation's founding, enslaved Black people "were considered property, and they were property because they were black. Their status as property was enforced by violence—actual or threatened." *Conditions of*

This cruel treatment continued well after slavery was outlawed by the Thirteenth Amendment to the U.S. Constitution. Black Americans remained constrained by the fear of state-sanctioned violence. Toward the end of the Reconstruction Era and through the 1900s, a "harsh social order" arose called Jim Crow, which was "enforced by new vigilante organizations, including the Ku Klux Klan, which terrorized African Americans and tortured and killed those who violated the new codes."[2] This racial violence swelled with tens of thousands killed, including the more than 4,000 lynchings taking place throughout the South between 1877 and 1950.[3] With impunity, Black Americans were mutilated, riddled with bullets, decapitated, and burned alive. White mobs knew no bounds when, for example, in 1918, they tied the ankles of Mary Turner, set her on fire, split her abdomen open with a knife while she was still alive, and stomped and crushed her unborn child.[4]

---

*Antebellum Slavery 1830-1860,* PBS ONLINE, https://www.pbs.org/wgbh/aia/part4/4p2956.html (last visited June 27, 2023). Black people were constantly beaten into submission, threatened with death, and humiliated in front of their families by their white owners to stoke fear and maintain the status quo. Black women were repeatedly raped and endured all forms of sexual exploitation by their overseers. *Id*.

[2] *Emancipation and Reconstruction*, LIBRARY OF CONGRESS, https://www.loc.gov/classroom-materials/immigration/african/emancipation-and-reconstruction/ (last visited June 27, 2023).

[3] EQUAL JUST. INITIATIVE, LYNCHING IN AMERICA: CONFRONTING THE LEGACY OF RACIAL TERROR 39, 44 (3rd ed. 2017), https://eji.org/wp-content/uploads/2005/11/lynching-in-america-3d-ed-110121.pdf.

[4] *History of Lynching in America*, NAACP, https://naacp.org/find-resources/history-explained/history-lynching-america (last visited June 27, 2023).

Black children were not spared from such depravity. Jesse Washington, Ernest Collins, Benny Mitchell, and Orion Anderson—all children—were lynched in the name of white supremacy.[5] These gruesome public lynchings were meant to traumatize the Black American community, and the white mobs who carried out these killings are who Defendants idolize and seek to emulate.

In 2019, the VGA passed a joint resolution that acknowledged the State's history of lynching. The resolution states that people across the country acted violently against Black Americans in defiance of the Reconstruction Amendments, and that Black Americans "lived in fear that their lives and the lives of loved ones could end violently at any time and in any place."[6] Unfortunately, that fear remains.

Today, a new generation of white supremacists, racists, and bigots carry on the work of their predecessors. Just last year, a self-described white supremacist gunned down Black people who were grocery shopping in Buffalo, New York. A trip to Walmart turned deadly in El Paso, Texas, when a white supremacist targeted Latinos, killing 22 people and injuring 23 others. A Saturday morning at the Tree of

---

[5] *Id.*; *Mob of 700 White People Lynches Two Black Teenagers in Colorado County, TX*, EQUAL JUST. INITIATIVE, https://calendar.eji.org/racial-injustice/nov/12 (last visited June 27, 2023); *"They Hanged Him," Richmond Dispatch* (*November 9, 1889*), ENCYCLOPEDIA VA., https://encyclopediavirginia.org/entries/they-hanged-him-richmond-dispatch-november-9-1889/ (last visited June 27, 2023); *Young Black Man Lynched for Allegedly Frightening White Girl in Leesburg, Virginia*, EQUAL JUST. INITIATIVE, https://calendar.eji.org/racial-injustice/nov/8 (last visited June 27, 2023).

[6] H.R.J. Res. 655, 2019 Leg. Sess. (Va. 2019).

Life synagogue became a horror scene when an antisemitic white supremacist shot 11 worshippers in Pittsburgh, Pennsylvania. A night out on the town became a night of terror when members of the LGBTQ+ community became the victims of a targeted mass shooting at a gay nightclub in Orlando, Florida. These bigoted attacks leave communities shaken and reinforce the history of animus and violence against various minority groups in America.

Similarly, here, Defendants sought to terrorize the Charlottesville community and leave it shaken and broken. Defendants' deep hatred of racial and religious minorities led them to orchestrate the Unite the Right Rally in order to start a self-described "race war."[7] During the rally, Defendants attacked peaceful counter-protesters and marched through the streets of Charlottesville wearing Nazi regalia, using Nazi slogans, and spewing hateful rhetoric like "Jews will not replace us!" and "blood and soil."[8] Defendants' vile actions, in fact, align with the rise in anti-Semitism in the United States, where Jews represent 2.4% of the population, but now

---

[7] J.A. 3464:24-65:2; J.A. 3634:16-35:1; J.A. 3727:7-16. Just like the violent reaction to the passage of the Reconstruction Era amendments, the Unite the Right Rally was a violent reaction to the planned removal of a Confederate monument in Charlottesville, VA. J.A. 2158:13-25; J.A. 3438:6-10; J.A. 4581; J.A. 4617-19. Progress for minorities is all too often a threat to hate groups like Defendants, and they repeatedly use violence to retaliate.

[8] J.A. 931:4-11; J.A.1080:20-23; J.A. 1084:20-85:4; J.A. 1701:5-10; J.A. 1742:1-14; J.A. 4401; J.A. 4352-53; J.A. 4421; J.A. 4645; J.A. 4770; J.A. 4776-77.

account for over 60% of targets of religious-based hate crimes.[9] Likewise, hate crimes against Black Americans rose by 14%, against LGBTQ+ persons by 70%, and against Asian Americans by a startling 167% within one year.[10]

In all, the history and continuation of violence against disfavored minorities is deeply embedded within the fabric of this country and must be considered by this Court when interpreting the Statutory Cap.

## II. *AMICI* HAVE LONG RELIED UPON PUNITIVE DAMAGES TO REMEDY AND DETER HATE CRIMES AND VIOLENCE.

Civil rights groups, such as *Amici*, and the individuals they represent turn to the courts to protect their civil and constitutional rights and to bring about justice. Substantial punitive damage awards have long proven to be a powerful means of remedying the profound damage wrought by white supremacists like Defendants,

---

[9] *Fact Sheet: Biden-Harris Administration Releases First-Ever U.S. National Strategy to Counter Antisemitism*, THE WHITE HOUSE (May 25, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/25/fact-sheet-biden-harris-administration-releases-first-ever-u-s-national-strategy-to-counter-antisemitism/.

[10] Weihua Li & Jamiles Lartey, *New FBI Data Shows More Hate Crimes. These Groups Saw The Sharpest Rise*, THE MARSHALL PROJECT (Mar. 25, 2023, 12:00 PM), https://www.themarshallproject.org/2023/03/25/asian-hate-crime-fbi-black-lgbtq; *see also FBI Releases 2021 Hate Crime Statistics*, U.S. DEP'T OF JUST., https://www.justice.gov/hatecrimes/hate-crime-statistics (last visited Apr. 24, 2023).

especially where criminal prosecution falls short—and deterring their conduct over time.[11]

For example, in 1984, Belulah Mae Donald, made history when she sued America's oldest hate group, the KKK. Ms. Donald was the mother of 19-year-old Michael Donald, who was kidnapped and lynched in Alabama by members of the KKK.[12] She made history again when she won a $7 million dollar judgment against the United Klans of America, one of the largest and most violent branches of the KKK.[13] The verdict effectively bankrupted the branch and forced it to turn over its headquarters to Ms. Donald to satisfy a portion of the judgment.[14]

Three years later, on Dr. Martin Luther King, Jr.'s birthday, members of two KKK factions assaulted an interracial group marching in Georgia.[15] Following in Ms. Donald's footsteps, the victims sued, and a federal jury assessed nearly $1 million against the two hate groups and their members. One group, The Invisible Empire, was forced to pay damages and disband, after which their office equipment

---

[11] *See* Damon Henderson Taylor, *Civil Litigation Against Hate Groups Hitting the Wallets of the Nation's Hate-Mongers*, 18 BUFF. PUB. INT. L. J. 95 (1999).

[12] *Donald v. United Klans of America*, No. 84-0725-AH (S.D. Ala. 1984).

[13] *Id.*

[14] Breeanna Hare, *Inside the Case That Bankrupted the Klan,* CNN (Apr. 11, 2021, 2:40 AM), https://www.cnn.com/2021/04/10/us/michael-donald-case-timeline/index.html.

[15] Complaint at 7, *McKinney v. Southern White Knights*, No. C87-565A (N.D. Ga Mar. 24, 1987).

was turned over to the NAACP.[16] Then, in 1994, a jury awarded $12.5 million in damages to the family of an Ethiopian student, Mulugeta Seraw, who was bludgeoned to death by gang members of the White Aryan Resistance ("WAR") in Portland.[17] WAR's assets were sold in order to satisfy the judgment.[18]

These verdicts obtained by *amicus* SPLC, and others like them,[19] demonstrate the importance and effectiveness of sizeable punitive damage awards in addressing violent hate crimes, deterring future offenses, and financially incapacitating hate groups. As such, Defendants should not be exempt from paying their debts to society for their hateful and violent conduct toward marginalized populations. Nor should they be able to pool resources to water down an award the jury meant as a deterrence to an amount easily raised by a quick round of shared fundraising.

---

[16] *McKinney v. Southern White Knights,* S. POVERTY L. CTR., https://www.splcenter.org/seeking-justice/case-docket/mckinney-v-southern-white-knights (last visited June 27, 2023).

[17] *Berhanu v. Metzger,* No. A8911-07007 (Or. Cir. Ct. 1990); *Berhanu v. Metzger*, S. POVERTY L. CTR., https://www.splcenter.org/seeking-justice/case-docket/berhanu-v-metzger (last visited June 27, 2023).

[18] *Id*.

[19] *See, e g.*, *Macedonia Baptist Church v. Christian Knights of the Ku Klux Klan – Invisible Empire, Inc.,* No. 96-CP-14-217 (C.P. County of Clarendon Jul. 24, 1998) (awarding a $21.5 million punitive damage award against the Christian Knights of the KKK); *Macedonia v. Christian Knights of the Ku Klux Klan*, S. POVERTY L. CTR., https://www.splcenter.org/seeking-justice/case-docket/macedonia-v-christian-knights-ku-klux-klan (last visited June 27, 2023).

## III.  THE VIRGINIA GENERAL ASSEMBLY COULD NOT HAVE INTENDED FOR THE STATUTORY CAP TO BE APPLIED TO CIVIL RIGHTS LITIGATION.

### A. Application of the Statutory Cap in Civil Rights Litigation Subverts Legislative Intent.

The Statutory Cap was originally enacted as part of certain tort reform efforts in the late 1980s.  A key purpose of these reforms was to address the VGA's concern that the cost of liability insurance coverage, which it deemed "necessary to the continued functioning of society and the continued availability of necessary goods and services," would escalate out of control, making insurance coverage inaccessible to communities, businesses, and individuals.[20]

Applying the Statutory Cap to civil rights litigation, like the case at bar, would run contrary to the legislature's intent and leads to an absurd result.[21] Moreover, such a sweeping application of the statute serves no discernible public policy at all, particularly under the extreme circumstances like the ones Defendants are responsible for. Rather, enforcing the cap inures to the benefit of white supremacist and hate groups that choose to commit violence in Virginia.

---

[20] Report of the Joint Subcommittee: Studying The Liability Insurance Crisis And The Need For Tort Reform, S. DOC. NO. 11, at 17 (1987).

[21] The doctrine of absurd results further supports this sensible construction of the statute. Generally, courts interpret statutes to avoid unreasonable or absurd results. *See* 73 Am. Jur. 2d Statutes § 155.

Unlike other torts traditionally covered by insurance, and, therefore, contemplated in the context of passing the cap, there are no adverse social or economic consequences for upholding large punitive damage awards for intentional hate-based violence and intimidation. As the VGA recognized, "[p]unitive damages are awarded to punish a defendant for his wrongful conduct and deter him and others from similar wrongful conduct."[22] Upholding the punitive damages award that a jury of peers found reasonable does just that—punishes each of the Defendants that plotted out and executed the race- and religious-based violence in Charlottesville, and deters similar groups from committing future acts of violence and intimidation on the basis of race, religion, sexual orientation, or gender identity in Virginia.

## B. The District Court's Decision May Incentivize Hate Groups to Escalate and Coordinate Violence.

Under the District Court's reading of the Statutory Cap, Defendants and like-minded extremist groups that commit mass atrocities against marginalized communities will be jointly and severally liable for one limited damage award. The District Court of course was not condoning such egregious conduct itself; however, its ruling creates incentives and unintended consequences. Namely, the District Court's interpretation will likely incentivize the pooling of resources by hate groups to commit mass violence without fear of legal consequences or serious financial

---

[22] S. Doc. No. 11, at 4.

accountability. Victims will be left without meaningful redress and with the fear of being revictimized because hate groups' conduct has gone undeterred. The math is distressingly simple and raises a critical concern: the greater the number of culpable actors in a single event, the greater number of individuals to split punitive damages awarded to their victims.

### C. The District Court's Decision Could Undermine Other Civil Rights Statutes and Cases.

The District Court's decision will not only have an adverse impact in matters involving hate-based violence but could also effectively empower tortfeasors to continue their harmful conduct in other contexts, including sexual harassment in the workplace and housing discrimination. This, in turn, could have detrimental effects on *Amici's* efforts to protect the civil rights of its members and communities across the Commonwealth of Virginia.

For example, HRC played a significant role in the passage of the Virginia Values Act in 2020, which created a private right of action for Virginians to assert their civil rights when discriminated against on the basis of their sexual orientation, gender identity, and other characteristics.[23] If not overturned, the District Court's decision would likely result in tortfeasors arguing for the imposition of the Statutory

---

[23] *See* Nick Morrow, *Virginia Values Act Signed Into Law—Extending Long-Delayed, Critical Protections to LGBTQ Virginians*, HUM. RTS. CAMPAIGN (Apr. 11, 2020), https://www.hrc.org/news/virginia-values-act-signed-into-law-extends-protections-to-lgbtq-virginians.

Cap in claims arising from this Act and in legislation with similar goals of protecting victims of discrimination, violence, and sexual misconduct. This would run counter to the broad goals of the Virginia Values Act: "building an inclusive Commonwealth where there is opportunity for everyone, and everyone is treated fairly."[24] If courts were to apply a cap to punitive damages to such a broad range of claims—outside of the original context of insurance—it would undermine civil rights actions and the ability of victims to seek full redress for their injuries from those responsible.[25]

## IV. APPLICATION OF THE STATUTORY CAP, LIMITED TO ITS INTENDED PURPOSE, WOULD PROMOTE EFFICIENT CIVIL RIGHTS LITIGATION.

The District Court's decision to mis-apply the Statutory Cap could result in litigants filing separate actions for civil rights claims arising from the same events against the same tortfeasors in an effort to maximize the potential punitive damages. Instead, judicial economy considerations should weigh heavily in favor of incentivizing plaintiffs to join together when there is a common set of facts and circumstances surrounding the alleged harm. Moreover, if the ruling stands, litigants would have no guarantee that their individual actions would be before the same

---

[24] *Id*.

[25] "The legacy of the Virginia Values Act represents tremendous progress for the Commonwealth of Virginia not only on LGBTQ equality, but also in grappling with racism and sexism. The act is a manifestation of the transformation of Virginia over time." Sarah Warbelow & Cathryn Oakley, *The Virginia Values Act: a Landmark Civil Rights Legislation Leapfrogs Virginia into a Leader on Equality*, 24 Rich. Pub. Int. L. Rev. 30 (2021).

judge, potentially leading to disparate outcomes in critical matters with significant societal impact. Discovery and trial would be repetitive across cases, time-insensitive, and costly to all parties involved. This is of particular concern to the *Amici* given the increasing number of violent domestic hate groups targeting racial and ethnic minorities, religious minorities, and the LGBTQ+ community.[26] All told, this would not serve the judiciary's goal of efficiently managing dockets and providing uniform enforcement of laws.

Restricting the Statutory Cap to the types of cases to which it was intended to apply is rooted in history and sound principles of statutory construction, while also serving the important goals of judicial efficiency and upholding bedrock civil rights statutes.

## **CONCLUSION**

*Amici* respectfully urge the Court to reverse the District Court's decision that reduced and capped the punitive damage award against Defendants.

Dated this 30th day of June 2023.

---

[26] In 2022, *amicus* SPLC tracked 1225 hate groups operating in the United States, with 43 of them operating in Virginia. *See Hate Map*, S. POVERTY L. CTR., https://www.splcenter.org/hate-map (last visited June 27, 2023). In 2021, the Federal Bureau of Investigation reported nearly 11,000 hate crimes in the United States against over 12,000 victims belonging to racial and ethnic minority, religious minority, and LGBTQ+ communities. *See FBI Releases 2021 Hate Crime Statistics*, U.S. DEP'T OF JUST., https://www.justice.gov/hatecrimes/hate-crime-statistics (last visited June 27, 2023).

Respectfully submitted,

BAKER & HOSTETLER LLP

By:  */s/ Edward J. Jacobs*
      Edward J. Jacobs
      Michelle N. Tanney
      Jonathan A. Forman
      Robyn M. Feldstein
      J'Naia L. Boyd
      Shade I. Quailey
      Sydney W. Park
      Baker & Hostetler LLP
      45 Rockefeller Plaza
      New York, New York 10111
      (212) 589-4200

      Kendall C. Kash
      Baker & Hostetler LLP
      Key Tower
      127 Public Square, Suite 2000
      Cleveland, Ohio 44114
      (216) 621-0200

      Sarah Warbelow
      Cynthia Cheng-Wun Weaver
      JP Schnapper-Casteras
      Human Rights Campaign
      Foundation
      1640 Rhode Island Avenue NW
      Washington, DC 20036
      (202) 628-4160

      Elizabeth Littrell
      Southern Poverty Law Center
      150 Ponce de Leon Avenue,
      Suite 340
      Decatur, Georgia 30030
      (404) 377-0708

Scott D. McCoy
Southern Poverty Law Center
2 Biscayne Boulevard, Suite 3750
Miami, Florida 33131
(334) 224-4309

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to <u>Fed. R. App. P. 32(g)</u>, the undersigned hereby certifies that:

1.      This brief complies with the type-volume limitation, as provided in Circuit Rule 29 and <u>Fed. R. App. P. 29(a)(5)</u>, because, exclusive of the exempted portions of the brief as provided by <u>Fed. R. App. P. 32(f)</u>, the brief contains 3,494 words.

2.      This brief complies with the typeface and type-style requirements, as provided in <u>Fed. R. App. P. 32(a)</u> and Circuit Rule 32(b), because the brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

3.      As permitted by <u>Fed. R. App. P. 32(g)(1)</u>, the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated this 30th day of June 2023.

<u>/s/ <em>Edward J. Jacobs</em>            </u>
Edward J. Jacobs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2023, I electronically filed the foregoing document through the court's electronic filing system, and that it has been served on all counsel of record through the court's electronic filing system.

Dated this 30th day of June 2023.

/s/ *Edward J. Jacobs*
Edward J. Jacobs