# 23-1119(L), 23-1122, 23-1154

# United States Court of Appeals
## *for the*
## Fourth Circuit

---

ELIZABETH SINES; SETH WISPELWEY, MARISSA BLAIR,
APRIL MUNIZ, MARCUS MARTIN, JOHN DOE, NATALIE
ROMERO, CHELSEA ALVARADO, THOMAS BAKER,

*Plaintiffs-Appellees/Cross-Appellants,*

TYLER MAGILL, HANNAH PEARCE,

*Plaintiffs,*

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

## BRIEF OF *AMICUS CURIAE*
## VIRGINIA LAW PROFESSORS
## IN SUPPORT OF PLAINTIFFS/CROSS-APPELLANTS

KYLE MCNEW, VSB#73210
DAVID THOMAS, VSB #73700
MICHIEHAMLETT
310 4th Street NE
Charlottesville, Virginia 22902
(434) 951-7234

*Counsel for Amicus Curiae Virginia
Law Professors*

CP  COUNSEL PRESS • VA – (804) 648-3664

-v-

MICHAEL HILL, MICHAEL TUBBS, LEAGUE OF THE SOUTH,
*Defendants/Appellants,*

JASON KESSLER, RICHARD SPENCER, CHRISTOPHER CANTWELL, JAMES ALEX FIELDS, JR., VANGUARD AMERICA, ANDREW ANGLIN, MOONBASE HOLDINGS, LLC, ROBERT AZZMADOR RAY, NATHAN DAMIGO, ELLITOO KLINE, a/k/a ELI MOSELY, IDENTITY EVROPA, MATTHEW HEIMBACH, DAVID MATTHEW PARROTT, a/k/a MATTHEW PARROTT, TRADITIONALIST WORKER PARTY, JEFF SCHOEP, NATIONAL SOCIALIST MOVEMENT, NATIONALIST FRONT, AUGUSTUS SOL INVICTUS, FRATERNAL ORDER OF THE ALT-KNIGHTS, MICHAEL ENOCH PEINOVICH, LOYAL WHITE KNIGHTS OF THE KU KLUX KLAN, EASAT COAST KNIGHTS OF THE KU KLUX KLAN, a/k/a EAST COAST KNIGHTS OF THE TRUE INVISIBLE EMPIRE,

*Defendants.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  23-119(L)         Caption:  Sines, et al. v. Hill, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Virginia Law Professors
(name of party/amicus)


who is _____ Amicus Curiae _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ E. Kyle McNew _____      Date: _____6/30/2023_____

Counsel for: Amicus Curiae Virginia Law Professor

Print to PDF for Filing

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ..............................................................................1

STATEMENT OF AMICUS IDENTITY AND INTEREST.................2

RULE 29(a)(4)(E) STATEMENT .....................................................2

ARGUMENT ......................................................................................2

    A.    A Brief History of Joinder.....................................................3

    B.    Virginia Still Applies the Common Law Rule on Permissive Joinder..................................................................5

    C.    An "Action" in the Punitive Damages Cap Means One Plaintiff ...............................................................................7

    D.    The Legislative History of the Cap Confirms That It Was Meant to Apply Per Plaintiff ................................................8

    E.    The Result Should Not Differ Between State and Federal Court.......................................................................12

CONCLUSION ................................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Branch v. Purdue Pharma, L.P.*,
  64 Va. Cir. 159 (Richmond 2004) ............................................................7

*Carufel v. Am. Isuzu Motors, Inc.*,
  47 Va. Cir. 529 (Spotsylvania County 1999) ..........................................7

*Cawlo v. Rose Hill Reserve Homeowners Ass'n*,
  106 Va. Cir. 235 (Fairfax County 2020) .................................................7

*Dixon v. Robertson*,
  5 Va. Cir. 544 (Henrico County 1979) ....................................................7

*Gasperini v. Center for Humanities*,
  518 U.S. 415 (1996) .................................................................... 13, 14, 15

*Guaranty Trust Co. v. York*,
  326 U.S. 99 (1945) ..................................................................................14

*Hamrick v. Shifflett*,
  55 Va. Cir. 423 (Rockingham County 2001) ........................................5, 7

*Hanna v. Plumer*,
  380 U.S. 460 (1965) ................................................................................14

*Parrish v. Hicks*,
  28 Va. Cir. 475 (Albemarle County 1992) ..............................................7

*Rasnick v. Pittston Co.*,
  5 Va. Cir. 336 (Wise County 1986) .........................................................7

*Va. Hot Springs Co. v. Hoover*,
  130 S.E. 408 (Va. 1925) ......................................................................5-6, 7

*White v. United States*,
  863 S.E.2d 483 (Va. 2021) .......................................................................5

*Xspedius Mgmt. Co. of Va., L.L.C. v. Stephan*,
  611 S.E.2d 385 (Va. 2005) .....................................................................10

**Statutes and Other Authorities:**

U.S. Const., amend VII .................................................................13

1987 VA. ACTS ch. 255 ..................................................................6

1995 VA. ACTS ch. 555 ..................................................................6

Fed. R. App. P. 29(a)(4) .................................................................2

NY CPLR § 5501(c) .....................................................................13

VA. CODE § 1-200 ..........................................................................5

VA. CODE § 1-201 ..........................................................................5

VA. CODE § 8.01-2(1) ......................................................................3

VA. CODE § 8.01-38.1 ...............................................................2, 10

VA. CODE § 8.01-267.1 ...................................................................6

VA. CODE § 8.01-267.5 ...................................................................6

Va. R. Sup. Ct. 3:12 ........................................................................5

Alan M. Trammell, *Transactionalism Costs*,
  100 Va. L. Rev. 1211 (2014) .........................................................4

Charles E. Clark, *History, Systems and Functions of Pleading*,
  11 VA. L. REV. 517 (1925) ............................................................4

Charles E. Clark, *Making Courts Efficient*,
  8 UCLA L. REV. 489 (1961) ...........................................................5

Charles M. Hepburn, THE HISTORICAL DEVELOPMENT OF CODE PLEADING
  IN AMERICA AND ENGLAND 51 (1897) ..............................................4

*History of Permissive Joinder of Parties* § 1651, 7 FED. PRAC. & PROC. CIV.
  (3d ed.) ....................................................................................4

REPORT OF THE COMMITTEE ON STATE CLASS ACTION LAW IN VIRGINIA,
  2011 Boyd Graves Conference .......................................................12

REPORT OF THE JOINT SUBCOMMITTEE STUDYING THE LIABILITY INSURANCE
  CRISIS AND THE NEED FOR TORT REFORM, Senate Doc. No. 11 (1987)...8, 9, 10, 11

Thomas O. Main, *Traditional Equity and Contemporary Procedure*,
  78 WASH. L. REV. 429 (2003) .........................................................3

**INTRODUCTION**

The question in this cross-appeal is whether Virginia's punitive damages cap, when it speaks of "any action," applies per case or, instead, per plaintiff within a case. Those accustomed to federal court—or any modern civil procedure regime, really—could be excused for equating "action" with "case" and thinking that there is just one cap per case number, regardless of the number of plaintiffs or defendants.

But this is a question of Virginia law, which has a tenuous relationship at best with legal modernity. What everyone else calls a motion to dismiss Virginia still calls a "demurrer." Up until 2005 Virginia trial judges were called "judge" and then an hour later "chancellor" depending upon whether they were sitting at law or equity; they were even supposed to change robes. Virginia did not have an appeal of right in civil cases until last year. And most importantly for the present case, in Virginia plaintiffs generally may not join in a single lawsuit. Thus, when the Virginia General Assembly spoke of "any action" in the punitive damages cap it was legislating against Virginia's common law backdrop in which an "action" meant one plaintiff. The cap could thus only ever apply per plaintiff. Both general Virginia legal history, as well as the specific legislative history of the punitive damages cap, show that the District Court erred when it applied the $350,000 punitive damages cap on a per-case basis rather than on a per-plaintiff basis.

## STATEMENT OF AMICUS IDENTITY AND INTEREST

The individuals identified at the conclusion of this brief are law professors who teach at Virginia law schools, primarily in the areas of civil procedure or torts. Their interest in this issue arises out of their knowledge of the unique nature of Virginia civil procedure. Their interest is also driven by the policy and doctrinal implications of the District Court's decision—erroneous, in their view—that a single punitive damages cap would apply regardless of how many individuals are injured by the defendants' conduct if those individuals elect to avail themselves of the efficiencies of joinder in federal court. All of the identified professors have authorized this brief to be filed on their behalf. They submit this brief solely on their own behalf, not as representatives of their universities; institutional affiliations are provided solely for purposes of identification.

## RULE 29(a)(4)(E) STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)((E), counsel for *amici* affirms that neither party's counsel authored this brief in whole or in part, that no party or their counsel contributed funds for the preparation of this brief, and that no other person contributed funds intended for the preparation of this brief.

## ARGUMENT

Virginia Code § 8.01-38.1 provides that "in any action . . . the total amount awarded for punitive damages against all defendants found to be liable shall be

determined by the trier of fact[, but] in no event shall the total amount awarded for punitive damages exceed $350,000." The cap applies regardless of the number of defendants—whether there is one or one hundred defendants, the total amount recoverable by the plaintiff is $350,000. But the statute is silent as to a situation involving multiple plaintiffs.[1]

The question thus becomes what the statute means when it speaks of an "action." The Code provides that "'action' and 'suit' may be used interchangeably and shall include all civil proceedings whether upon claims at law, in equity, or statutory in nature and whether in circuit courts or district courts." VA. CODE § 8.01-2(1). But this still begs the question: a civil proceeding by whom? Just one plaintiff or multiple plaintiffs? Answering this question requires an understanding of the historical baseline against which the General Assembly was legislating when it enacted the punitive damages cap, as well as the specific history of the punitive damages cap.

## A.    A Brief History of Joinder

At common law, joinder was a virtually nonexistent concept. *See* Thomas O. Main, *Traditional Equity and Contemporary Procedure*, 78 WASH. L. REV. 429 (2003) ("Single-issue pleading precluded the joinder of multiple claims or defenses,

---

[1] Much meaning can and should be drawn from this silence in contrast to the explicit statement that the cap applies "against all defendants." But the textual analysis is not the focus of this brief.

the joinder of multiple parties, and pleading in the alternative.")  Separate plaintiffs simply could not prosecute their claims jointly.  *See, e.g.*, Charles E. Clark, *History, Systems and Functions of Pleading*, 11 VA. L. REV. 517, 528–29, 534, 536 (1925) (noting that English common law did not permit joinder of parties); *History of Permissive Joinder of Parties* § 1651, 7 FED. PRAC. & PROC. CIV. (3d ed.) ("permissive joinder of plaintiffs, in the sense that plaintiffs whose rights were several had an option to join their claims, did not exist [at common law]"); *see also* Alan M. Trammell, *Transactionalism Costs*, 100 Va. L. Rev. 1211 (2014) ("At common law, litigation focused on just two parties (or sets of parties).").  Even a plaintiff with multiple claims arising out of the same dispute usually could not prosecute the claims jointly.  Charles M. Hepburn, THE HISTORICAL DEVELOPMENT OF CODE PLEADING IN AMERICA AND ENGLAND 51, 53 (1897) ("A plaintiff might have a breach of contract claim based on a contract under seal and another on a contract not under seal against the same defendant. The defendant might have no objection to their joinder. But they could not be joined, as the former claim sounded in covenant while the latter in assumpsit-two different forms of action.").  Thus, at common law, an action was typically a single plaintiff advancing a single claim against a single defendant.

**B.  Virginia Still Applies the Common Law Rule on Permissive Joinder.**

Virginia received the English common law unless and until altered by the General Assembly.  VA. CODE §§ 1-200 & 1-201.  The exact date at which to fix Virginia's adoption of the English common law remains an open question, but the very latest it could have occurred was 1792.  *White v. United States*, 863 S.E.2d 483, 486 n.5 (Va. 2021).  Thus, the English common law's prohibition of joinder of plaintiffs was incorporated into Virginia jurisprudence and remains in place unless it has been modified by more recent binding law.  *See, e.g.*, Charles E. Clark, *Making Courts Efficient*, 8 UCLA L. REV. 489, 491 n. 6 (1961) (noting that Virginia was not among the states that incorporated the Federal Rules of Civil Procedure or any "substantial portions of the federal system, notably the discovery and the joinder rules" as of 1961); Charles E. Clark, *History, Systems and Functions of Pleading*, 11 VA. L. REV.,517, 528–29, 534, 536 (1925) (observing that as of 1925, Virginia had not adopted any form of the new pleading practices and was considered a fully "common law state").

No Virginia rule or statute abrogates the common law by freely permitting multiple plaintiffs to permissively join in a single lawsuit.[2]  The only legislative

---

[2] Rule 3:12 of the Rules of the Supreme Court of Virginia governs the joinder of defendants, and references the possibility of joinder of plaintiffs in equitable matters such as declaratory judgment actions or the like.  *See, e.g.*, *Hamrick v. Shifflett*, 55 Va. Cir. 423, 423-24 (Rockingham County 2001) (citing *Va. Hot Springs Co. v.*

action touching upon joinder of plaintiffs is the Virginia Multiple Claimant Litigation Act.  VA. CODE § 8.01-267.1 *et seq.*.  The Act permits joinder of six or more plaintiffs whose claims involve common issues and arise out of the same transaction or occurrence.  *See id.* § 8.01-267.1 (permitting a court to order joinder or consolidation of "separate civil actions" that satisfy the requirements of the Act); *id.* § 8.01-267.5 (permitting six or more plaintiffs whose claims satisfy the requirements of the Act to join "initially as plaintiffs in a single action").

There are two important points about the Multiple Claimant Litigation Act for present purposes.  The first is the Act's very existence—the need to have a limited statutory mechanism permitting joinder of six or more plaintiffs confirms that joinder of plaintiffs generally is not available in Virginia.  Second, the Act was enacted in 1995.  1995 VA. ACTS ch. 555.  The punitive damages cap was enacted in 1987.  1987 VA. ACTS ch. 255.  The wording, structure, and even the existence of the 1995 Act thus has no bearing upon discerning what the General Assembly was thinking when it spoke of "any action" in 1987 with the punitive damages cap.

As for case law on joinder, there is no binding authority addressing whether joinder of plaintiffs is permitted in Virginia.  However, there is a very large body of Virginia Circuit Court decisions recognizing that joinder of plaintiffs is not permitted

---

*Hoover*, 130 S.E. 408 (Va. 1925)) (describing the historical ability of plaintiffs to join as plaintiffs in the equity court seeking injunctive-type relief).

outside the framework provided by the Multi-Claimant Act. *See, e.g.*, *Cawlo v. Rose Hill Reserve Homeowners Ass'n*, 106 Va. Cir. 235, 244 (Fairfax County 2020) ("The authority to consolidate cases or claims does not allow for the consolidation of the parties. The joinder of multiple plaintiffs in a single action remains a misjoinder.").[3]

## C.    An "Action" in the Punitive Damages Cap Means One Plaintiff.

The upshot of all of this is that among Virginia judges, practitioners, and legislators an "action" or "suit" usually means a single plaintiff. That was absolutely true in 1987 when the punitive damages cap was enacted. So when the General Assembly was drafting the punitive damages cap, it could not have envisioned a

---

[3] *See also Branch v. Purdue Pharma, L.P.*, 64 Va. Cir. 159 (Richmond 2004) (acknowledging the general rule in Virginia "that several complainants having distinct and independent claims to relief against a defendant cannot join in a suit for separate relief in each") (quoting *Va. Hot Springs Co. v. Hoover*, 130 S.E. 408, 410 (1925)); *Hamrick v. Shifflett*, 55 Va. Cir. 423, 424 (Rockingham County 2001) (dropping all but one plaintiff in a suit resulting from a single-car accident on account of misjoinder because each plaintiff has a distinct, separate, and independent claim for damages); *Carufel v. Am. Isuzu Motors, Inc.*, 47 Va. Cir. 529, 530 (Spotsylvania County 1999) ("[P]ersons who have separate and distinct interests or are separately affected by the tortious act of another are generally unable to unite as plaintiffs in an action for injuries sustained. They must bring separate actions."); *Parrish v. Hicks*, 28 Va. Cir. 475, 478-79 (Albemarle County 1992) (dropping additional plaintiffs whose claims arose from same motor vehicle accident); *Rasnick v. Pittston Co.*, 5 Va. Cir. 336, 337 (Wise County 1986) (dropping all but one plaintiff on account of misjoinder because the plaintiffs had separate and distinct claims against the defendants); *Dixon v. Robertson*, 5 Va. Cir. 544, 546 (Henrico County 1979) (dropping additional plaintiffs whose claims arose from same motor vehicle accident).

multi-plaintiff "action" at law[4] because such a thing did not exist in Virginia. The General Assembly could certainly envision a multi-defendant action, which is why it explicitly addressed that scenario in the statute. But there would never have been any question but that each plaintiff would be entitled to his or her own full punitive damages cap because, when the cap was enacted, there could only be one plaintiff per action at law in Virginia.

**D.    The Legislative History of the Cap Confirms That It Was Meant to Apply Per Plaintiff.**

The punitive damages cap was the result of a multi-year legislative study, debate and, of course, negotiation. The process began in 1985 with a proposed bill aimed at dealing with the liability of municipalities and their inability to obtain reasonably priced insurance coverage. *See* REPORT OF THE JOINT SUBCOMMITTEE STUDYING THE LIABILITY INSURANCE CRISIS AND THE NEED FOR TORT REFORM, Senate Doc. No. 11, at 3 (1987) [hereinafter "REPORT"].[5] The bill was defeated in 1985, but it prompted the formation of an informal subcommittee to continue studying the issue. That committee recognized that the scope of the inquiry needed to be expanded because the problem of affordable liability insurance was not unique

---

[4] As referenced *supra* note 2, there was limited authority permitting joinder of plaintiffs in equity. But cases involving damages, and thus punitive damages, were heard on the law side of the court, where an "action" would involve only a single plaintiff.

[5] *Available at* https://rga.lis.virginia.gov/Published/1987/SD11/PDF.

to municipalities. *Id.* at 3. Thus, in 1986, a formal Senate Joint Resolution was adopted to create a joint subcommittee to study both the issue of affordable insurance coverage and the tort liability system in Virginia. *Id.* at 4.

The result of this joint subcommittee's work was the REPORT. While the joint subcommittee recognized the existence of a widespread "liability insurance crisis," it had a difficult time identifying the actual causes of the crisis, and specifically as related to Virginia. *Id.* at 10. The committee found that the "Virginia civil justice system contributes to a relatively stable loss environment for liability insurers," and notably acknowledged that it "found no evidence that punitive damages were being awarded too frequently or in excessive amounts in Virginia." *Id.* Nevertheless, the committee recognized that the problem was real and therefore made various legislative proposals. *Id.* at 11.

In its Executive Summary of these legislative proposals, the only proposed cap on damages was described as follows:

> That a limitation be placed on the amount of non-economic damages which may be awarded in order to strike a proper balance between affording an injured person his rightful compensation for losses incurred and providing a degree of predictability of loss exposure necessary to a system of compensation such as ours which is largely dependent upon the continued availability of insurance.

*Id.* at 5. What this describes is unequivocally not a cap on punitive damages. It is a cap on noneconomic compensatory damages in personal injury cases, harms like pain, suffering, emotional distress, inconvenience, and loss of enjoyment. It also

9

makes clear that the focus was on damages awarded to a single plaintiff—"an injured person"—and not an aggregated group of plaintiffs.

The committee's more detailed explanation of the proposal confirms that it focused on compensatory damages, not punitive damages. The committee discussed the cap with reference to the need to fairly compensate a victim for her injuries. *Id.* at 17. This tie-in to the concept of compensation shows that the cap proposal was not focused on punitive damages at all because, in Virginia, the "purpose of punitive damages is not so much to compensate the plaintiff but to punish the wrongdoer and to warn others." *Xspedius Mgmt. Co. of Va., L.L.C. v. Stephan*, 611 S.E.2d 385, 387 (Va. 2005) (internal quotations omitted). Indeed, the phrase "punitive damages" does not appear at all in the explanation of the proposed cap.

To accomplish its proposal to place a cap on noneconomic damages, the committee offered a statutory proposal to be codified as Virginia Code § 8.01-38.1. *See* REPORT, App'x F8. And this is where things get interesting for purposes of determining what the General Assembly was envisioning when it spoke of an "action" in the punitive damages cap that it ultimately enacted. The language for the proposed cap on noneconomic damages was:

> **In any action** accruing on or after July 1, 1987, for personal injury or death, including an action for medical malpractice… the total amount awarded for noneconomic damages against all defendants found to be liable shall not exceed the greater of three times the amount of damages awarded for economic losses or $250,000. As a part of any verdict in such an action the trier of fact shall itemize the award to reflect the

10

> monetary amount intended for part medical expenses, future medical expenses, past lost earnings, future lost earning and lessening of earning capacity, other economic expenses or loss resulting from the injury or death, punitive damages and noneconomic damages.
>
> As used in this section, "noneconomic damages" . . . does not include punitive damages.

*Id.* (emphasis added). By explicitly excluding punitive damages from the meaning of noneconomic damages, punitive damages would have remained uncapped under the committee's proposal.

The proposed cap on noneconomic damages spoke in terms of an "action." It was bounded at the upper end by a multiple of the plaintiff's economic damages. No one would envision a personal injury noneconomic damages cap as an aggregate cap across multiple plaintiffs in a (then mythical in Virginia) multi-plaintiff case. Compensatory damages in personal injury cases are uniquely individualized, so a cap on noneconomic compensatory damages would, perforce, apply on a per-plaintiff basis. The proposed cap would probably apply no matter how many different claims a given plaintiff brought, but no defendant would be able to contend that a single compensatory damages cap applied even if he had tortiously injured multiple plaintiffs.

Following the release of the REPORT, legislative sausage was made and horses traded. The proposed § 8.01-38.1 that would have capped only personal injury noneconomic compensatory damages became the actual § 8.01-38.1 that capped

only punitive damages. But while the substance of the legislation changed completely, the "any action" formulation remained in the text. Thus, just as the "action" envisioned by the proposed noneconomic damages cap necessarily applied per plaintiff, so too does the punitive damages cap that was ultimately adopted.

**E.    The Result Should Not Differ Between State and Federal Court.**

A Virginia court construing the punitive damages cap immediately after its enactment would certainly have understood it to apply per plaintiff because the idea of a multi-plaintiff action for damages was foreign to Virginia practice. It remains practically foreign today. A multi-plaintiff single action for damages can exist only if six or more plaintiffs choose to file jointly under the statutory mechanism of the Multiple Claimant Act, a situation that occurs very infrequently. *See, e.g.*, REPORT OF THE COMMITTEE ON STATE CLASS ACTION LAW IN VIRGINIA, 2011 Boyd Graves Conference, at 1-2 (noting that the Multiple Claimant Litigation Act had been in effect for twelve years but "has not been widely used").[6] Thus, under Virginia law, an "action" was and is generally understood to describe the claims brought by a single plaintiff, meaning that each plaintiff is entitled to his or her own full cap of punitive damages.

---

[6] *Available at* https://cdn.ymaws.com/www.vba.org/resource/resmgr/imported/BG11_4.pdf.

So, the problem here is one of translation—how to apply the concept of an "action" from a state procedural regime that generally does not envision multi-plaintiff lawsuits to the federal system, a regime that permits and even encourages them. Broadly speaking, this is an *Erie* question. But within that body of case law, *Gasperini v. Center for Humanities*, 518 U.S. 415 (1996), provides the best analytical framework.

The question in *Gasperini* was how to reconcile New York's law requiring exacting appellate review of jury verdicts with the Seventh Amendment's greater deference to jury verdicts. *Id.* at 418-19. The Court observed that the New York provision permitting appellate courts to closely examine verdicts for excessiveness was, under the *Erie* rubric, "both 'substantive' and 'procedural': 'substantive' in that § 5501(c)'s 'deviates materially' standard controls how much a plaintiff can be awarded; 'procedural' in that § 5501(c) assigns decisionmaking authority to New York's Appellate Division." *Id.* at 426. Thus, the question was "whether federal courts can give effect to the substantive thrust of § 5501(c) without untoward alteration of the federal scheme for the trial and decision of civil cases." *Id.*

In analyzing this question, the Court observed that an early case applying *Erie* framed the question as whether it would "significantly affect the result of a litigation for a federal court to disregard a law of a State that would be controlling in an action upon the same claim by the same parties in a State court." *Id.* at 427 (quoting

*Guaranty Trust Co. v. York*, 326 U.S. 99 (1945)).  The idea behind this "outcome-determination" test was that in a federal case under diversity jurisdiction, "the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court."  *Id.* at 428.  A later *Erie* case counseled that the "outcome-determination" test "must be guided by the twin aims of the *Erie* rule: discouragement of forum shopping and avoidance of inequitable administration of the laws."  *Id.* (quoting *Hanna v. Plumer*, 380 U.S. 460, 468 (1965)).

Applying these concepts to the New York statute in question, the Court first observed that no one disputed that "a statutory cap on damages would supply substantive law for *Erie* purposes."  *Id.*  Although it acknowledged that the New York statute was different than a statutory damages cap, "it was designed to provide an analogous control."  *Id.* at 429.  Thus, ignoring the state law in diversity cases could lead to "substantial variations between state and federal money judgments," which is precisely what *Erie* and its progeny mean to avoid.  *Id.* at 429-30.

So too here.  The punitive damages cap is undeniably a matter of Virginia substantive law.  A Virginia court applying the cap in a case with multiple plaintiffs would apply it per plaintiff, not per case number, because at the time the cap was enacted in Virginia an "action" was understood to mean the set of claims advanced by a single plaintiff.  A federal court applying the cap per case number, as the District

Court did here, would lead to the exact "substantial variations between state and federal money judgments" that *Gasperini* and the rest of the *Erie* doctrine aim to avoid.

Moreover, such a decision would unquestionably lead to forum shopping, one of the chief ills that *Erie* seeks to prevent. No plaintiff's attorney in her right mind would file a Virginia-law multi-plaintiff case in federal court if there were even a possibility of punitive damages. Conversely, every defendant would move heaven and earth to remove a multi-plaintiff Virginia case with a punitive damages element to federal court to get the benefit of such a ruling.

Returning to the question posed by *Gasperini*, there would be no "untoward alteration of the federal scheme for the trial and decision of civil cases" if this Court reverses the District Court's decision. 515 U.S. at 426. Virginia's punitive damages cap can easily be applied per plaintiff in a federal case without doing violence to any federal procedural priorities.

## CONCLUSION

This question only exists because Virginia civil procedure is anachronistic. Applying the punitive damages cap against the historical common law backdrop prohibiting joinder of plaintiffs leads to the conclusion that the cap should be applied per plaintiff. The District Court's decision on this point should be reversed.

Respectfully Submitted,

*/s/ Kyle McNew*

Kyle McNew, VSB#73210
David Thomas, VSB #73700
MICHIEHAMLETT
310 4th Street NE
Charlottesville, Virginia 22902
(434) 951-7234
*Counsel for Amicus Curiae Virginia Law Professors*

*AMICUS CURIAE*
**VIRGINIA LAW PROFESSORS**

Leslie Kendrick
White Burkett Miller Professor of Law and Public Affairs
Elizabeth D. and Richard A. Merrill Professor of Law
University of Virginia School of Law
Charlottesville, Virginia

Alan Trammell
Associate Professor
Washington and Lee University School of Law
Lexington, Virginia

Amanda Frost
John A. Ewald Jr. Research Professor of Law
University of Virginia School of Law
Charlottesville, Virginia

Joan M. Shaughnessy
Roger D. Groot Professor of Law Emerita
Washington and Lee University School of Law
Lexington, Virginia

David Eggert
Professor of Practice
Washington and Lee University School of Law
Lexington, Virginia

George Rutherglen
Distinguished Professor of Law
Earle K. Shawe Professor of Employment Law
University of Virginia School of Law
Charlottesville, Virginia

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. __23-1119__     **Caption:** __Elizabeth Sines v. Michael Hill__

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ____3,761____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
__MS Word_____ [*identify word processing program*] in
__Times New Roman, 14 pt._____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) __E. Kyle McNew_____

Party Name __Amicus Curiae VA Law Professors__

Dated: __6/30/2023_____

# CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2023, I served the following via ECF:

David L. Campbell
Justin Saunders Gravatt
Duane, Hauck, Davis & Gravatt, P.C.
100 West Franklin Street, Suite 100
Richmond, VA 23220
dcampbell@dhdglaw.com
jgravatt@dhdglaw.com

*Counsel for Cross-Appellee James A. Fields, Jr.*

Bryan Jones
106 W. South St., Suite 211
Charlottesville, VA 22902
bryan@bjoneslegal.com

*Counsel for Cross-Appellees Michael Hill, Michael Tubbs, and League of the South*

Elmer Woodard
5661 US Hwy 29
Blairs, VA 24527
isuecrooks@comcast.net
James E. Kolenich
Kolenich Law Office
9435 Waterstone Blvd. #140
Cincinnati, OH 45249
JIM@TradLawyer.com
*Counsel for Cross-Appellees Nathan Damigo and Identity Europa, Inc. (Identity Evropa)*

William Edward ReBrook, IV
The ReBrook Law Office  6013
Clerkenwell Court
Burke, VA 22015
1420 Cardinal Road
Charleston, WV 25314
edward@rebrooklaw.com
rebrooklaw@gmail.com
*Counsel for Cross-Appellees Matthew Heimbach, Matthew Parrott, Traditionalist Worker Party, National Socialist Movement, and Nationalist Front*

Joshua Smith
Smith LLC
807 Crane Avenue
Pittsburgh, PA 15216-2079
joshsmith2020@gmail.com

*Counsel for Cross-Appellees Matthew Heimbach, Matthew Parrott, and Traditionalist Worker Party*

Roberta A. KAPLAN
GABRIELLE E. TENZER
KAPLAN HECKER & FINK
LLP
350 Fifth Avenue, 63rd Floor New
York, New York 10118 (212) 763-
0883

Raymond P. Tolentino
KAPLAN HECKER & FINK
LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883

David E. Mills
Joshua M. Siegel
Caitlin B. Munley
Robby Lee Ray Saldaña Khary J.
Anderson
COOLEY LLP
1299 Pennsylvania Avenue, NW,
Suite 700
Washington, DC 20004
(202)842-7800

Alan D. Levine
COOLEY LLP
55 Hudson Yards
New York, New York 10001
(212) 479-6000

Karen L. Dunn
Jessica E. Phillips
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006
(202) 223-7300

Yotam Barkai
MELINA MARIA MENEGUIN
LAYERENZA PAUL, WEISS,
RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas New
York, New York 10118
(212) 373-3000

I further hereby certify that on June 30, 2023, I also served the

following via electronic mail:

Christopher Cantwell
christopher.cantwell@gmail.com

I further hereby certify that on June 30, 2023, I caused to be served the following by physical mail:[1]

Jason Kessler
6256 Bullet Dr.
Crestview, FL 32536

1100 Wythe Street, Unit 1812
Alexandria, VA 22313

Vanguard America
c/o Dillon Hopper
383 Hazzard Street
Scottsburg, IN 47170

Robert "Azzmador" Ray
22345 Cherry Lane
Frankston, TX 75763

Jeff Schoep
PO Box 66335
Roseville, MI 48066

Moonbase Holdings, LLC c/o
Andrew Anglin
6827 N. High Street, Ste. 121
Worthington, OH 43085

P.O. Box 208 Worthington, OH
43085

Richard Spencer
734 Clearwater Drive
Whitefish, MT 59937

Elliott Kline a/k/a Eli Mosley 117
Mesa Drive
Reading, PA 19608

Augustus Sol Invictus 424 E.
Central Blvd #156
Orlando, FL 32801

---

[1] [18] In addition to the herein-described service via U.S. Mail and electronic mail, Plaintiffs-Appellees/Cross-Appellants served the brief to the following Defendants who have not consented to service via electronic mail: Elliott Kline (eli.f.mosley@gmail.com; deplorabletruth@gmail.com; eli.r.kline@gmail.com); Jeff Schoep (commander@newsaxon.com); Richard Spencer (richardbspencer@icloud.com; richardbspencer@gmail.com); Robert Ray (azzmador@gmail.com); and Vanguard America c/o Dillon Hopper (dillon_hopper@protonmail.com).

East Coast Knights of the Ku Klux Klan
a/k/a East Coast Knights of the True
Invisible Empire
26 South Pine St.
Red Lion, PA 17356

Loyal White Knights of the Ku Klux
Klan
c/o Chris and Amanda Barker
2364 US Highway 158 E
Yanceyville, NC 27379

Fraternal Order of the Alt-Knights
c/o Kyle Sean Chapman
52 Lycett Circle
Daly City, CA 94015

*/s/ E. Kyle McNew*